IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RICKIE L. JOHNSON, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | Civil Action No. 3:12-CV-1790-D |
| VS. | § | |
| | § | |
| BAE SYSTEMS LAND & | § | |
| ARMAMENTS, L.P., | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM OPINION
AND ORDER

In this action by four African-American plaintiffs and one Hispanic plaintiff alleging claims for race discrimination and retaliation arising from a reduction in force ("RIF"), the court decides motions for summary judgment, to strike the testimony of two of plaintiffs' expert witnesses, and for severance or separate trials. For the reasons explained, the court grants in part and denies in part the motion for summary judgment and denies the motions to strike expert testimony and for severance or separate trials.

I

This is a lawsuit by five plaintiffs—Rickie Johnson ("Johnson"), Robert Allen ("Allen"), Levi Daniels ("Daniels"), Carl Whitley ("Whitley"), and Eduardo Dominguez ("Dominguez")—alleging that defendant BAE Systems Land & Armaments ("BAE") is liable for race discrimination, in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*., and the Texas Commission on Human Rights Act ("TCHRA"), Tex. Labor Code Ann. § 21.001 *et seq.* (West 2006), and for

retaliation, in violation of Title VII and the TCHRA.   All five plaintiffs assert race discrimination claims under § 1981, Title VII, and the TCHRA; three plaintiffs—Johnson, Whitley, and Dominguez—bring retaliation claims under Title VII and the TCHRA.

BAE designs, develops, and produces combat vehicles and munitions that are used by military and law enforcement.[1]   Under a contract with the U.S. Army, BAE provides on-site technical support for vehicles and munitions at Fort Hood in Killeen, Texas.   Plaintiffs were employees of BAE who worked at Fort Hood.   Johnson, Allen, Daniels, and Whitley are African-American, and Dominguez is Hispanic.   BAE maintains that it terminated plaintiffs' employment in April 2011 as part of a RIF.

At the time of their terminations, Allen, Daniels, and Whitley were Field Service Representatives ("FSRs"), while Johnson and Dominguez were Senior Field Service Representatives ("Sr. FSRs").[2]   The only other employee terminated during the RIF was James Cole ("Cole"), a Caucasian FSR.   At the time of the RIF, there were twelve Sr. FSRs and twenty FSRs.   The only two minority Sr. FSRs—Johnson and Dominguez—were terminated in the RIF, leaving ten Sr. FSRs, all of whom were Caucasian.   Three of the four African-American FSRs were terminated (Allen, Daniels, and Whitley), leaving fourteen

---

[1]In deciding BAE's summary judgment motion, the court views the evidence in the light most favorable to plaintiffs as the summary judgment nonmovants and draws all reasonable inferences in their favor.  *See, e.g., Owens v. Mercedes-Benz USA, LLC*, 541 F.Supp.2d 869, 870 n.1 (N.D. Tex. 2008) (Fitzwater, C.J.) (citing *U.S. Bank Nat'l Ass'n v. Safeguard Ins. Co.*, 422 F.Supp.2d 698, 701 n.2 (N.D. Tex. 2006) (Fitzwater, J.)).

[2]FSRs and Sr. FSRs generally perform the same tasks and have the same skill sets. They are distinguished only by seniority or experience.

Caucasian FSRs, one African-American FSR, one Hispanic FSR, and one Asian FSR.

Earl Briggs ("Briggs") was in charge of the Fort Hood division and initially hired all of the plaintiffs, except Allen. He did not, however, directly supervise the FSRs or Sr. FSRs; that responsibility belonged to his Staff FSRs. Joe Joyce ("Joyce"), an African-American, was the Staff FSR responsible for supervising plaintiffs when they were hired, but Joyce retired in March 2010. Briggs replaced Joyce with George Clarkson ("Clarkson"), a Caucasian, who assumed Joyce's responsibility as Staff FSR. Clarkson shared this responsibility with Pete Atherholt ("Atherholt") until Atherholt retired in December 2011. As Staff FSRs during the period in question, Clarkson and Atherholt supervised plaintiffs' employment and reported directly to Briggs.

In 2009 Whitley made several complaints to Clarkson about the use of racially derogatory language by coworkers at BAE. In particular, he complained to Clarkson that an employee named Chris Trubee ("Trubee") told several African-American employees that he was "going to pull [his] whip out and make [them get] to work." D. App. 601. He also complained to Clarkson that a Caucasian contractor named Ray Swoda ("Swoda") repeatedly referred to a Hispanic employee as a "dumb-ass Mexican." *Id.* at 607. When Whitley complained about Swoda's comments, Clarkson smiled and walked away.

In September 2010 Johnson sent an email to Briggs, Clarkson, and Atherholt complaining about the use of racially derogatory language by several BAE employees and contractors who worked in the motor pool at Fort Hood. Around the same time, he also had a telephone conversation with Clarkson during which he complained that a contractor named

Adam Brewer ("Brewer") had used the "N word" while at work.

The following month Briggs determined that a RIF was necessary.  He notified David Bautista ("Bautista") in BAE's Human Resources Department ("HR") and began working on the RIF.  Under company policy, Briggs was required to draft a RIF business plan.  A RIF business plan asks for certain information about a proposed RIF, including the reasons for the RIF, the anticipated dates of separation for those selected for termination, the positions likely to be eliminated, and the names of the employees likely to be laid off as a result of the RIF.

Clarkson and Atherholt provided Briggs with information that he included in the first RIF business plan, which was submitted on November 24, 2010 (the "November 2010 Plan").  The November 2010 Plan attributed the RIF to a shift in demand for M9 ACE vehicle support.  The section explaining the reason for the proposed RIF stated, in pertinent part:

> In the 2000-2002 timeframe the company received new contracts for [FSRs] to support units equipped with M9 ACE vehicles.  During that period the . . . department hired three ACE FSRs to support the customers' needs.  Based on additional contract requirements . . . we added three to our ACE FSR staff bringing the total to six.
>
> The requirements for ACE FSRs peaked in the 2006 timeframe and our last contract requirement was completed in December 2008.  As the requirements began to decline we initiated actions to cross-train the ACE FSRs onto other vehicle systems such as HERCULES and Paladin.  This cross-training met with varied degrees of success with the end result that they are still not qualified to support . . . platforms other than the ACE nor do we project their being able to do so in the foreseeable future.  As a

> result we now have six ACE FSRs on staff that are not qualified
> to support other systems or [contract] projects.
>
> *   *   *
>
> In order to bring the FSR staffing in line with contractual
> requirements and the projected 2011 Operating Budget a
> Reduction in Force is requested for the group of ACE FSRs.

Ps. App. 485 (alteration added). The plan identified Allen, Dominguez, Johnson, Whitley,

Cole, and Joseph Malong ("Malong") as employees likely to be considered for termination

under the RIF.

Briggs, Clarkson, and Atherholt continued to work on the RIF until Briggs submitted

the final RIF business plan on March 28, 2011 (the "March 2011 Plan"). The March 2011

Plan, like the November 2010 Plan, identified Allen, Dominguez, Johnson, Whitley, and

Cole as employees likely to be laid off. But it removed Malong from the original list and

added Daniels and Ronald DeShong ("DeShong"). The narrative section of the document

(quoted above) remained substantially the same, but it was revised to state that the division

now had seven, as opposed to six, "ACE FSRs on staff that are not qualified to support other

systems or [contract] projects." *Id.* at 488 (alteration added).

Although the March 2011 Plan, like the November 2010 Plan, attributed the RIF to

a reduction in demand for M9 ACE vehicle work, Daniels, who was added to the list, had

never been considered an ACE FSR at any point during his tenure with BAE. Another BAE

employee who *was* considered an ACE FSR was not included in the RIF. And DeShong,

who is Caucasian, was not actually terminated despite being listed on the March 2011 Plan.

While the RIF was being debated, HR provided Briggs, Clarkson, and Atherholt several forms and spreadsheets to use during the process for deciding whom to select for termination under the RIF.  Initially, Briggs, Clarkson, and Atherholt used a RIF selection form with three major categories: "Performance," "Criticality," and "Discipline."  Each category had a number of subcategories and provided for the allotment of points on a 1-5 scale.  Supervisors were expected to evaluate their subordinate employees for their abilities in each category, assign a numerical score for each category, and sum the scores.  This sum would result in a total score, which would reflect an overall rating for the employee.  After employees were rated, Briggs, Clarkson, and Atherholt were expected to sort the forms from lowest to highest overall rating.  Employees with the lowest overall ratings were to be considered first for termination under the RIF.

Briggs, Clarkson, and Atherholt did not complete RIF selection forms for every FSR and Sr. FSR in the Fort Hood division.  Instead, Briggs completed RIF selection forms only for the employees who had already been selected for termination and identified under the November 2010 Plan.  Because Briggs did not directly supervise any of the FSRs or Sr. FSRs selected for termination, he relied on information provided by Clarkson and Atherholt when completing the forms.

In December 2010 HR replaced the RIF selection forms with a more comprehensive spreadsheet.  In March 2011 another HR employee, Steven Routson ("Routson"), began assisting Briggs with the RIF.  Routson provided Briggs with a modified spreadsheet template.  Briggs revised the spreadsheet at least ten times during the period between January

and April 2011.  By the end of the revision process, and although the spreadsheets included categories not covered by the RIF selection forms, the same six employees who had been previously identified for termination using the RIF selection forms were identified for termination on the final spreadsheet.

When Briggs initially received the spreadsheet template from Routson, the spreadsheet contained data that had been entered, or "pre-populated," using HR's software. But Briggs, Clarkson, and Atherholt created new definitions for several categories on the spreadsheet, and Briggs asked Routson to add these definitions to the final spreadsheet. After consulting with Clarkson and Atherholt about the spreadsheet, Briggs entered values under each category (including the categories governed by the newly created definitions) for the FSRs and Sr. FSRs in his group.  These values were largely, if not exclusively, based on the subjective opinions of Clarkson and Atherholt.  Once values were entered on the spreadsheet, the values were summed, yielding a total score that reflected an overall rating for the employee.  The FSRs and Sr. FSRs were then sorted on the spreadsheet based on their overall ratings, and the final spreadsheet ranked Johnson, Allen, Daniels, Dominguez, Whitley, Cole, and DeShong as the lowest-performing members in Briggs's division.

During this revision process, certain employees' scores were repeatedly changed. Some of plaintiffs' scores were lowered on the same day—even though the selection criteria remained constant over time.  During his deposition, Routson explained that it was possible for managers, such as Briggs, to manipulate the individual values in the spreadsheet to see what impact different scores would have on an employee's overall rating and whether the

- 7 -

ultimate outcome of who would be selected for termination would change.  Neither Routson nor Bautista was sure why Briggs made revisions to the spreadsheet during this time.  Two versions of the spreadsheet were titled "What If 2010."  When asked why these drafts were titled this way, Briggs testified, "I don't know."  *Id.* at 198.

On the first spreadsheet, which was created in mid-January 2011, Daniels was ranked 22nd, with ten employees ranked below him, including employees who were never selected for termination.  The six employees who were initially listed on the November 2010 Plan—Allen, Dominguez, Johnson, Whitley, Cole, and Malong—were highlighted in red. During his deposition, Briggs admitted that he highlighted these six employees in red, but when asked why, he testified: "I don't recall exactly."  *Id.* at 193.  In an email from Briggs to Bautista dated January 11, 2011, Briggs expressed concern that using the new spreadsheet would justify the termination of individuals other than the six initially listed on the November 2010 Plan, stating:

> Expanding the population and using the spreadsheet is also complicating the selection.  We have been basing the reduction on the absence of M9 ACE work and the fact that we have FSRs who were hired solely to work ACE and they lack the skills to transition on to other platforms.  The ratings show that the 6 ACE FSRs [Allen, Dominguez, Johnson, Whitley, Cole, and Malong] are in the bottom 10-11 of the rankings.  Therefore, we pick up 4 non-ACE FSRs whose documented performance puts them in the bottom group of rankings.  I would not envision preparing a business case to retain any of these.  Your thoughts?

*Id.* at 442 (bracketed material added, paragraph break omitted).  The four non-ACE FSRs to whom Briggs referred were Andre Destremps ("Destremps"), Daniel Wood ("Wood"),

Michael Garrett ("Garrett"), and DeShong.  By the time the final spreadsheet was created, Destremps, Wood, and Garrett had moved up in the rankings—ahead of Daniels—and were not selected for termination.  DeShong remained in the bottom six, but he was not terminated.

In late January or early February of 2011—during the time in which Briggs, Clarkson, and Atherholt were discussing alterations to the spreadsheet—Whitley and John Strickland ("Strickland"), an employee of another company that shared the motor pool with BAE at Fort Hood, overheard a conversation between Clarkson and Swoda while working in the motor pool.  During this conversation, Swoda complained of financial difficulties caused by his divorce.  Clarkson expressed sympathy for him and told him: "When I get rid of these 'N words', I'll bring you on as an FSR."  *Id.* at 375 (describing conversation); 376 (clarifying that Clarkson "said ni---r" (alteration added)[3]); D. App. 600 (deposition testimony of Whitley that he heard Clarkson tell Swoda, "when I get rid of some of the ni---rs, I'll hire you").

Plaintiffs were terminated in April 2011. Clarkson and Bautista informed Johnson, Allen, Daniels, Whitley, and Dominguez of their terminations in the motor pool in front of their coworkers.  Cole, the only other employee terminated during the RIF, was notified separately at one of BAE's offices, away from coworkers.

Following their discharge, plaintiffs filed this suit against BAE, bringing claims of race discrimination under § 1981, Title VII, and the TCHRA.  Johnson, Whitley, and

---

[3]In this memorandum opinion and order, the court has used the redaction "ni---r" in place of the actual term.  Accordingly, the court will not hereafter indicate that the term has been altered.

Dominguez also assert retaliation claims under Title VII and the TCHRA.  BAE moves for summary judgment on all claims, or, alternatively, on plaintiffs' request for punitive damages.  Plaintiffs oppose the motion.

II

Because plaintiffs will bear the burden of proof on their claims for race discrimination and retaliation, BAE can meet its summary judgment obligation by pointing the court to the absence of admissible evidence to support the claim in question.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once BAE does so, plaintiffs must go beyond their pleadings and designate specific facts showing that there is a genuine issue for trial.  *Id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).  An issue is genuine if the evidence is such that a reasonable trier of fact could return a verdict in plaintiffs' favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Plaintiffs' failure to produce proof as to any essential element of a claim renders all other facts immaterial.  *TruGreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.).  Summary judgment is mandatory if plaintiffs fail to meet this burden.  *Little*, 37 F.3d at 1076.

III

BAE moves for summary judgment on plaintiffs' race discrimination claims, contending that plaintiffs have not established a prima facie case of race discrimination, and that they have failed to create a genuine issue of material fact that BAE's stated legitimate, nondiscriminatory reason for terminating plaintiffs is pretextual.

A

Plaintiffs bring this claim under 42 U.S.C. § 1981, Title VII, and the TCHRA, but the court for convenience will refer throughout this memorandum opinion and order only to Title VII because "Title VII and [§] 1981 require the same proof to establish liability." *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403 n.2 (5th Cir. 1999) (citing *Bunch v. Bullard*, 795 F.2d 384, 387 n.1 (5th Cir. 1986)). "Similarly, the law governing claims under the TCHRA and Title VII is identical." *Id.* (citing *Colbert v. Ga.-Pac. Corp.*, 995 F. Supp. 697 (N.D. Tex. 1998) (Kendall, J.)). "Because these three statutory bases are functionally identical for the purposes of [plaintiffs'] claims, it would be redundant to refer to all of them." *Id.*

Under Title VII, it is an "unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's race[.]" 42 U.S.C. § 2000e-2(a)(1). To prevail on their discrimination claim, plaintiffs must present direct or circumstantial evidence that their race was a motivating factor for BAE's adverse employment action. *See, e.g., Siddiqui v. AutoZone W., Inc.*, 731 F.Supp.2d 639, 648 (N.D. Tex. 2010) (Fitzwater, C.J.) (addressing Title VII claims for rase-based harassment, discrimination based on race, ethnicity, national origin, and religion, and retaliation) (citing *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 652 (5th Cir. 2004)). "'Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption.'" *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 384 n.3 (5th Cir. 2003) (Fitzwater, J.) (age discrimination case) (quoting *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002)). "If

an inference is required for the evidence to be probative as to [BAE's] discriminatory animus in firing [plaintiffs], the evidence is circumstantial, not direct." *Sandstad*, 309 F.3d at 897-98.

"If the plaintiff provides direct evidence, then the burden shifts to the employer to prove that the same adverse action would have occurred regardless of discriminatory animus." *Jones v. Overnite Transp. Co.*, 212 Fed. Appx. 268, 272 (5th Cir. 2006) (per curiam) (citing *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)).   If the plaintiff provides circumstantial evidence, "the modified *McDonnell Douglas* approach" applies. *See Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004) (age discrimination case).

As modified, *McDonnell Douglas* consists of three stages.  First, plaintiffs must establish a prima facie case of discrimination, which "creates a presumption that [BAE] unlawfully discriminated against [them]." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

> To establish a prima facie case of intentional discrimination in a reduction-in-force case, a plaintiff must establish the following elements: (1) he is a member of a protected group; (2) he was adversely affected by the employer's decision; (3) he was qualified to assume another position at the time of discharge; and (4) there is sufficient evidence, either circumstantial or direct, from which a fact finder may reasonably conclude that the employer intended to discriminate in reaching the adverse employment action, or others who were not members of the protected class remained in similar positions.

*Ortiz v. Shaw Grp., Inc.*, 250 Fed. Appx. 603, 606 (5th Cir. 2007) (per curiam) (citing *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996); *Amburgey v. Corhart*

*Refractories Corp.*, 936 F.2d 805, 812 (5th Cir. 1991)).

Second, if plaintiffs establish a prima facie case of race discrimination, the burden shifts to BAE to articulate a legitimate, nondiscriminatory reason for the employment action taken against plaintiffs. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993). BAE's burden is one of production, not proof, and involves no credibility assessments. *See, e.g., West*, 330 F.3d at 385. BAE's "burden requires the production of admissible evidence in support of its nondiscriminatory reasons." *Hervey v. Miss. Dep't of Educ.*, 404 Fed. Appx. 865, 868 (5th Cir. 2010) (per curiam) (citing *Burdine*, 450 U.S. at 255).

Third, if BAE meets its production burden, plaintiffs may prove intentional discrimination by proceeding under one of two alternatives: the pretext alternative or the mixed-motives alternative. *See Rachid*, 376 F.3d at 312. Under the pretext alternative, plaintiffs must "offer sufficient evidence to create a genuine issue of material fact . . . that [BAE's] reason is not true, but is instead a pretext for discrimination[.]" *Id.* (citation and internal quotation marks omitted). Under the mixed-motives alternative, plaintiffs must offer sufficient evidence to create a genuine issue of material fact "that [BAE's] reason, while true, is only one of the reasons for its conduct, and another motivating factor is [plaintiffs'] protected characteristic[.]" *Id.* (citation and internal quotation marks omitted). "If the plaintiff shows that the illegal discrimination was a motivating factor, then the defendant may respond with evidence that the same employment decision would have occurred regardless of discriminatory animus." *Ortiz*, 250 Fed. Appx. at 606 (citing *Rachid*, 376 F.3d at 312).

- 13 -

B

Plaintiffs argue that they have produced direct evidence of discrimination, and that, as a result, they do not need to satisfy the elements of the *McDonnell Douglas* framework. They contend that Clarkson's promise to Swoda, a Caucasian contractor, that he would hire him as an FSR after he "g[o]t rid of these [ni---rs]," Ps. App. 375, constitutes direct evidence of discrimination because Clarkson was a decisionmaker with regard to the RIF, he made this statement around the time plaintiffs were selected for termination (and within three months of the termination itself), and the statement refers to plaintiffs' protected class.[4]  BAE replies that Clarkson's statement is not direct evidence of discrimination because it requires an inference that Clarkson intended to terminate plaintiffs' employment *because* they are African-American, and that Clarkson's statement merely establishes that Clarkson was aware of plaintiffs' race.  BAE posits that Clarkson's statement is, at most, circumstantial evidence of discrimination, and that it is insufficient to create a genuine issue of material fact that BAE's reason for its adverse employment action is pretextual.  Because the court concludes below that, even if Clarkson's statement is merely circumstantial evidence of discrimination, plaintiffs have adduced evidence sufficient to create a genuine issue of material fact on all essential elements of their claim, the court will assume *arguendo* that Clarkson's statement is circumstantial evidence, and it will apply the modified *McDonnell Douglas* burden-

---

[4]Plaintiffs do not directly address the fact that the comment does not pertain to Dominguez's protected class.

shifting framework to analyze their race discrimination claims.[5]

## C

The court first considers whether plaintiffs have established a prima facie case of discrimination. In its brief, BAE cites and applies the elements of a prima facie case of race discrimination for a non-RIF case, even though its stated legitimate, nondiscriminatory reason for plaintiffs' terminations is a RIF. As a result, several of BAE's contentions are inapposite because they do not pertain to the elements of a prima facie case involving a RIF.[6] *See, e.g., Ortiz*, 250 Fed. Appx. at 606; *Nichols*, 81 F.3d at 41; *Amburgey*, 936 F.2d at 812. Nevertheless, the court will consider BAE's arguments under the third stage of the *McDonnell Douglas* framework, discussed below, because each contention bears on the ultimate question whether there is evidence sufficient to create a genuine issue of material fact about whether BAE intentionally discriminated against plaintiffs.

As to the prima facie case, the court holds that plaintiffs have satisfied all four elements. Plaintiffs are members of a protected class because Johnson, Allen, Daniels, and

---

[5]The Fifth Circuit and this court have noted repeatedly that direct evidence of discrimination is rare. *See, e.g.*, *Rutherford v. Harris County, Texas*, 197 F.3d 173, 180 n.4 (5th Cir. 1999) (sex discrimination case) (stating that because direct evidence is rare in discrimination cases, plaintiffs must ordinarily use circumstantial evidence to satisfy burden of persuasion). But the statement attributed to Clarkson brings this case to the brink of—if not squarely within—the group of rare cases.

[6]For example, BAE argues that there is no evidence that plaintiffs were replaced by persons outside of their respective protected classes. *See* D. Br. 32. This argument relates to the fourth element of a prima facie case in a non-RIF case of race discrimination. *See, e.g., Deanes v. N. Miss. State Hosp.*, 543 Fed. Appx. 366, 369 (5th Cir. 2013) (per curiam) (citing *Okoye v. Univ. of Tex. Hous. Health Sci. Ctr.*, 245 F.3d 507, 513 (5th Cir. 2001)).

- 15 -

Whitley are African-American, and Dominguez is Hispanic.  They suffered an adverse employment action because they were terminated in April 2011.  They were qualified to assume another position at the time of the discharge because they had been employed as FSRs and Sr. FSRs before the RIF, and, although they were discharged, the FSR and Sr. FSR positions were not completely eliminated (i.e., other FSRs and Sr. FSRs were retained).  And they have produced evidence from which a reasonable trier of fact could find that BAE intended to discriminate in selecting them for inclusion in the RIF, and that others who were not members of the protected classes remained in similar positions.  Accordingly, the court holds that plaintiffs have established a prima facie case of race discrimination.

D

The court next considers whether BAE has met its burden to produce admissible evidence in support of its proffered legitimate, nondiscriminatory reason for plaintiffs' terminations.  BAE's stated reason is that plaintiffs were terminated as part of a RIF.  "A [RIF] 'is itself a legitimate, nondiscriminatory reason for discharge.'"  *Bourgeois v. Miss. Valley State Univ.*, 507 Fed. Appx. 386, 388 (5th Cir. 2013) (per curiam) (quoting *EEOC v. Tex. Instruments Inc.*, 100 F.3d 1173, 1181 (5th Cir. 1996)); *see also Badilla v. Bombardier Aerospace Corp.*, 2003 WL 23017671, at *4 (N.D. Tex. Dec. 18, 2003) (Fitzwater, J.).  BAE has introduced evidence that it undertook the RIF because of a decrease in M9 ACE vehicle work and a corresponding shift in demand for BAE's services, which in turn necessitated budget cuts.

Plaintiffs contend that BAE has failed to carry its burden to produce evidence in

support of its proffered legitimate, nondiscriminatory reason because the RIF was a sham, or, alternatively, that the RIF was legitimate on its face but implemented so that race was impermissibly used as a factor to determine which employees were terminated.  The court disagrees with plaintiffs' position.   Although a defendant's proffered legitimate, nondiscriminatory reason must be sufficiently clear "to afford the employee a realistic opportunity to show that the reason is pretextual," *Patrick v. Ridge*, 394 F.3d 311, 317 (5th Cir. 2004), BAE's stated reason satisfies this requirement because it identifies a specific reason why the RIF was undertaken: to cut costs because of a decrease in M9 ACE vehicle work and a concomitant shift in demand for BAE's services.  The evidence on which plaintiffs rely to show that the RIF was a sham or that it was implemented by using race as a factor is properly considered at the third stage of the *McDonnell Douglas* framework, because this evidence essentially challenges the truth or credibility of BAE's proffered reason.  BAE's burden at this stage is merely one of production, not proof, and involves no credibility assessments.  *See, e.g., West*, 330 F.3d at 385.  Thus the court holds that BAE has met its burden of production.

E

Because BAE has met its burden of production, the burden shifts to plaintiffs to introduce evidence that would permit a reasonable trier of fact to find that BAE's stated legitimate, nondiscriminatory reason is pretextual.

1

Plaintiffs must create a genuine issue of material fact under one of the alternative

methods of proof.  They attempt to show that BAE's justification is pretextual; they make no attempt to establish that BAE acted with mixed motives.  The court will therefore consider plaintiffs' arguments under the pretext alternative.  *See, e.g., Siddiqui*, 731 F.Supp.2d at 651 (considering plaintiff's discrimination claim only under pretext alternative because plaintiff contended that defendant's stated justification for termination was pretextual and did not clearly contend that defendant had mixed motives).

To establish pretext, plaintiffs must show that BAE's "proffered explanation is false or unworthy of credence." *Vaughn v. Woodforest Bank*, 665 F.3d 632, 637 (5th Cir. 2011) (quoting *Laxton*, 333 F.3d at 578) (citation and internal quotation marks omitted).  "The inquiry is focused on whether [BAE]'s explanation, accurate or not, is 'the real reason' for firing [plaintiffs]." *Id.* (quoting *Laxton*, 333 F.3d at 579).  "[Plaintiffs] must produce evidence, viewed in the light most favorable to [them], that would permit a [trier of fact] to believe that [BAE]'s proffered reason for firing [them] was not its true reason but simply pretext for a racially discriminatory reason." *Id.* (citing *Laxton*, 333 F.3d at 579).  "Such rebuttal evidence, combined with the prima facie case, will suffice to create a genuine issue of material fact such that summary judgment is inappropriate." *Id.* at 637-38 (citing *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 351 (5th Cir. 2005)).

2

The court holds that a reasonable trier of fact could find that BAE's proffered

legitimate, nondiscriminatory reason is pretextual.  For example,[7] plaintiffs have adduced evidence that four of the five plaintiffs (Johnson, Allen, Whitley, and Dominguez) were initially selected for termination on the November 2010 Plan, and that Briggs, Clarkson, and Atherholt manipulated the selection process to ensure that, even after new selection criteria were introduced through selection forms and spreadsheet templates, these same four plaintiffs would be among the group laid off.  Plaintiffs have also presented evidence that the fifth plaintiff (Daniels) was added to the termination list during this revision process, even though his initial performance scores ranked him above several Caucasian FSRs who were not selected for termination.  Although Briggs was the titular decisionmaker for the RIF, Clarkson's discriminatory animus can be imputed to Briggs under a "cat's paw" analysis.  "To invoke the cat's paw analysis, [plaintiffs] must submit evidence sufficient to establish two conditions: (1) that a co-worker exhibited discriminatory animus, and (2) that the same co-worker 'possessed leverage, or exerted influence, over the titular decisionmaker.'" *Roberson*, 373 F.3d at 653 (quoting *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 227 (5th Cir. 2000)).  Plaintiffs have satisfied both elements.  They have produced evidence that Clarkson told Swoda, a Caucasian contractor, that once he "g[o]t rid of these [ni---rs]," he would "bring [Swoda] on as an FSR [with BAE]."  Ps. App. 375.  And it is undisputed that

---

[7]"When this court denies rather than grants summary judgment, it typically does not set out in detail the evidence that creates a genuine issue of material fact."  *Valcho v. Dall. Cnty. Hosp. Dist.*, 658 F.Supp.2d 802, 812 n.8 (N.D. Tex. 2009) (Fitzwater, C.J.) (citing *Swicegood v. Med. Protective Co.*, 2003 WL 22234928, at *17 n.25 (N.D. Tex. Sept. 19, 2003) (Fitzwater, J.)).

Clarkson participated in, and Briggs relied on his input throughout, the RIF selection process.

BAE argues that plaintiffs cannot rely on the cat's paw theory here because Swoda was not actually hired by BAE after plaintiffs were terminated.  But whether BAE followed through on Clarkson's promise to Swoda is immaterial.  The relevant question is whether Clarkson's comment exhibits discriminatory animus.  His use of the epithet "ni---rs" unquestionably satisfies this element.  *See, e.g., Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 993 (5th Cir. 2005) ("[R]acial epithets undoubtedly demonstrate racial animus."); *see also Knatt v. Hosp. Serv. Dist. No. 1 of E. Baton Rouge Parish*, 327 Fed. Appx. 472, 485 (5th Cir. 2009) ("Our cases have recognized, and we repeat, that the term 'ni---r' is a universally recognized opprobrium, stigmatizing African-Americans because of their race." (citation and internal quotation marks omitted)).

BAE also contends that it is entitled to the "same-actor inference," which supports a presumption that plaintiffs' terminations were not discriminatory.  BAE maintains that this presumption is proper because Briggs hired four of the five plaintiffs.  When "the same actor hires and fires an employee, an inference that discrimination was not the employer's motive in terminating the employee is created."  *Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 320 n.3 (5th Cir. 1997) (citing *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir. 1996)).  "The inference is not unassailable, however, and a plaintiff may overcome it by presenting evidence of 'sufficiently egregious' facts."  *Curry v. Telect, Inc.*, 2009 WL 1659344, at *4 (N.D. Tex. June 15, 2009) (Fitzwater, C.J.) (quoting *Brown*, 82 F.3d at 658).  The court holds, for reasons that it otherwise explains, that plaintiffs have produced evidence of

- 20 -

sufficiently egregious facts to overcome the same-actor inference and to enable a reasonable trier of fact to find that BAE's articulated reason for discharging plaintiffs is pretextual.

BAE also maintains that plaintiffs have failed to rebut its legitimate, nondiscriminatory reason for their terminations because they have failed to prove that there was a specific need for their skills—specifically, skills related to M9 ACE vehicle work—after April 2011. But plaintiffs have produced evidence that, although the 2011 terminations were purportedly based on a shift in demand for M9 ACE vehicle work, the last contract for M9 ACE vehicle support actually ended in December 2008—more than two years before the RIF. And there is evidence that Johnson did not work on M9 ACE vehicles after 2006, that Dominguez did not work on M9 ACE vehicles after 2007, and that Daniels *never* worked on M9 ACE vehicles. A reasonable trier of fact could infer based on these facts and other evidence in the summary judgment record that BAE's proffered legitimate, nondiscriminatory reason is false or unworthy of credence because this evidence suggests that a shift in demand for M9 ACE vehicle work was not the real reason why plaintiffs were included in the RIF.

BAE replies that this evidence is not probative of discriminatory intent because BAE initially attempted to cross-train its M9 ACE FSRs on other platforms and only eventually decided to terminate those who could not perform adequately on other systems. While the trier of fact may find this evidence persuasive at trial, plaintiffs have adduced evidence that they completed cross-training on other systems, and that several of them performed well on other platforms, such as the HERCULES and Paladin vehicle systems. As a result, plaintiffs

have carried their burden of producing evidence sufficient for a reasonable trier of fact to find that BAE's stated reason for their terminations is false or unworthy of credence.

BAE next argues that plaintiffs' self-evaluation of their skills is not evidence of pretext, that employers have wide discretion to rate their employees during a RIF selection process, and that the mere fact that some of the criteria used during the RIF selection process were subjective is not evidence of discrimination. The court's decision to deny summary judgment on plaintiffs' race discrimination claim is consistent with these principles. Plaintiffs do not rely *merely* on the self-evaluation of their skills or the subjectivity of the selection criteria used during the RIF decisionmaking process. Their showing is based on other evidence of discrimination. For example, they have introduced evidence that Briggs instructed HR to change the selection criteria based on definitions that he created in collaboration with Clarkson and Atherholt; that Briggs had the opportunity to manipulate individual values in the spreadsheet to see what impact different scores would have on employees' overall ratings and whether the ultimate outcome of who would be selected for termination would change; that neither Routson nor Bautista knew why the spreadsheet had been revised during the relevant period; and that Briggs, Clarkson, and Atherholt could not explain why they entered certain values for some of the plaintiffs' scores on the spreadsheet. Plaintiffs have also produced evidence that some of the plaintiffs' scores were dramatically lowered on the same day, without any apparent explanation, even though the selection criteria remained unchanged. This evidence would not *compel* a reasonable trier of fact to find in plaintiffs' favor, and there is certainly evidence in the summary judgment record to

support the finding that BAE did not discriminate based on race.  But a reasonable trier of fact *could* find in plaintiffs' favor, and this is what is required to defeat summary judgment.

In its reply brief, BAE contends that plaintiffs cannot establish pretext because they have failed to produce evidence that any plaintiff was "clearly better qualified" than the FSRs or Sr. FSRs who were retained.  Relying primarily on *Baumeister v. AIG Global Investment Corp.*, 420 Fed. Appx. 351 (5th Cir. 2011), and *Johnson v. Earth Grains Baking Co.*, 203 F.3d 828, 1999 WL 1240842 (5th Cir. Dec. 1, 1999) (per curiam), BAE argues that plaintiffs' failure to identify specific comparators for each plaintiff and to produce evidence that each plaintiff was clearly better qualified than his comparator forecloses plaintiffs' attempt to create a genuine issue of material fact as to pretext.  The court disagrees.

Unlike this case, in *Baumeister* and *Johnson* the plaintiffs failed to produce other evidence of pretext; that is, the plaintiffs relied *exclusively* on a comparison of their qualifications to those of retained employees to create a genuine issue of material fact regarding pretext.  *See Baumeister*, 420 Fed. Appx. at 354 (noting that plaintiff attempted to rebut defendant's proffered legitimate, nondiscriminatory reason only by comparing her qualifications to qualifications of a retained employee); *Johnson*, 1999 WL 1240842, at *1 (noting that plaintiff did not offer "any affirmative indicia of unlawful discrimination" besides evidence of her qualifications compared to those of a retained employee, which were essentially in "equipoise").[8]  Here, by contrast, plaintiffs do not rely exclusively on a

---

[8]For the same reason, *Hall v. Sealy, Inc.*, 2011 WL 4389701, at *6-7 (N.D. Tex. Sept. 21, 2011) (Fitzwater, C.J.) (age discrimination case), which BAE also cites, is

comparison of qualifications.  They have produced other evidence to rebut BAE's proffered legitimate, nondiscriminatory reason.

Moreover, and contrary to BAE's characterization, plaintiffs have produced evidence that they were, in fact, better qualified than at least some of the Caucasian employees who were retained.  For example, there is evidence that Clarkson considered Daniels more qualified than Garrett (at least based on performance reviews for the year 2010), that Clarkson considered Daniels more qualified than DeShong (at least for certain work), and that Clarkson considered Dominguez more qualified than Roger Vann (at least for certain work).  BAE disputes this characterization of the evidence, arguing that Clarkson never admitted that he considered any plaintiff *generally* or *absolutely* more qualified than someone who was retained.  Instead, it posits that, at most, Clarkson admitted that he considered a plaintiff more qualified than a retained employee in a limited sense—e.g., only when the comparison was based on performance reviews for a single year, or only when the comparison was based on an evaluation of their work on certain platforms.  But plaintiffs have adduced proof that would enable a reasonable trier of fact to reject BAE's interpretation of the evidence and to find that plaintiffs were better qualified than certain coworkers who

---

distinguishable.  *Hall* explains the principle, recognized in *Baumeister* and *Johnson*, that "[i]n a RIF case, a plaintiff can prove pretext by introducing evidence that she was *clearly* better qualified than [other] employees who were retained."  *Hall*, 2011 WL 4389701, at *6 (citation and internal quotation marks omitted).  In other words, the plaintiff can prove discrimination based on comparative qualifications alone only if she produces evidence that she was *clearly* better qualified as opposed to just better qualified.  But she need not make this showing where she relies on other evidence of pretext, or on evidence of comparative qualifications in combination with other evidence of pretext.

were retained.  The evidence is therefore sufficient to create a genuine issue of material fact.

BAE also argues in its reply brief that the fact that the spreadsheet went through multiple revisions is not itself evidence of pretext, and that, at most, the summary judgment record reflects minor procedural irregularities that are not sufficient to raise an inference of discrimination.  But viewing the evidence in the light most favorable to plaintiffs and drawing all reasonable inferences in their favor, the record reflects more than a series of isolated procedural irregularities.  A reasonable trier of fact could find based on the totality of the evidence that Briggs manipulated the RIF selection process as a *post hoc* justification for terminating the employees who had been included in the RIF initially, for discriminatory reasons (the same six employees who were highlighted in red on the first spreadsheet).  Furthermore, BAE's procedural-irregularities theory does not explain why Daniels was initially listed 22nd—with ten employees ranked below him—on the first spreadsheet, but had been moved down to the bottom six by the end of the revision process.

BAE also contends that, even if Clarkson's comment is considered circumstantial evidence of discriminatory animus toward African-Americans, it is not probative as to the reason for Dominguez's termination because the comment does not refer to Hispanics.  Assuming *arguendo* that Clarkson's statement to Swoda is not probative as to Dominguez's termination, BAE is still not entitled to summary judgment on Dominguez's race discrimination claim because a reasonable trier of fact could find that BAE's proffered legitimate, nondiscriminatory reason for the discharge is pretextual.  When combined with Dominguez's prima facie case, this rebuttal evidence is sufficient to create a genuine issue

of material fact. *See Vaughn*, 665 F.3d at 637-38; *Machinchick*, 398 F.3d at 351.  This result follows from the fact that plaintiffs' evidence rebutting BAE's proffered legitimate, nondiscriminatory reason is the same for all five plaintiffs, even though Dominguez is of a different race from the other plaintiffs.  "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000).  Assuming *arguendo* that Dominguez cannot rely on Clarkson's comment to establish discriminatory intent, he can nevertheless rely on "the general principle . . . that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'" *Id.* (citing *Wright v. West*, 505 U.S. 277, 296 (1992)).  "[O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Id.* at 147.  Accordingly, "[Dominguez]'s prima facie case, combined with sufficient evidence to find that [BAE]'s asserted justification is false, may permit the trier of fact to conclude that [BAE] unlawfully discriminated." *Id.* at 148.

Finally, the court disagrees with BAE's position on the pretext issue to the extent BAE attempts to analyze a piece (or type) of evidence in isolation, and then rely on cases that support the premise that if this piece (or type) of evidence were the *only* evidence of pretext, it would be insufficient to raise a genuine issue of material fact.  The proper inquiry is whether the totality of the evidence is sufficient to create a genuine issue of material fact regarding pretext. *See Shackelford*, 190 F.3d at 404 (noting that if court reaches pretext

stage, the issue is "whether the totality of the evidence, including the evidence raised at the prima facie case and pretext stages, raises a genuine issue of material fact" as to whether defendant terminated plaintiff because of race).

The court therefore holds that a reasonable trier of fact could find from the evidence in the summary judgment record that BAE's proffered legitimate, nondiscriminatory reason for terminating plaintiffs is pretextual.  Accordingly, the court denies BAE's motion for summary judgment addressed to plaintiffs' race discrimination claims.

IV

BAE moves for summary judgment on the retaliation claim brought by Johnson, Whitley, and Dominguez, contending that they have not established a prima facie case of retaliation, that they have failed to create a genuine issue of material fact that BAE's stated legitimate, nondiscriminatory reason for terminating them is pretextual, and that they have not created a genuine issue of material fact that they would not have been terminated even in the absence of any protected activity.  Plaintiffs bring this claim under Title VII and the TCHRA, but, for the reason explained above, the court will refer only to Title VII in this memorandum opinion and order.

A

Title VII makes it unlawful "for an employer . . . to discriminate against any individual . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."  42 U.S.C. § 2000e-

3(a).  To determine whether each plaintiff has established their retaliation claim under Title

VII, the court applies the same modified *McDonnell Douglas* approach discussed *supra* in

§ III(A).  *See, e.g., Cohen v. Univ. of Tx. Health Sci. Ctr.*, ___ Fed. Appx. ___, 2014 WL

523615, at *3 (5th Cir. Feb. 11, 2014) (applying modified *McDonnell Douglas* framework

to retaliation claim).  Although the analysis is the same at the second and third stages of the

inquiry, the analysis differs at the first stage because the elements of a prima facie case of

retaliation are, of course, different from those for a prima case of race discrimination.  To

establish a prima facie case of retaliation, a plaintiff must demonstrate that "(1) he engaged

in a protected activity, (2) an adverse employment action occurred, and (3) a causal link

existed between the protected activity and the adverse employment action." *Walker v. Norris

Cylinder Co.*, 2005 WL 2278080, at *9 (N.D. Tex. Sept. 19, 2005) (Fitzwater, J.) (citing

*Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996)).

   Here, the second element of the prima facie case is satisfied because Johnson,

Whitley, and Dominguez were terminated.[9]  The remaining questions are whether they

---

[9]In their response, plaintiffs make the conclusory assertion that BAE "failed to provide them with job opportunities, training, promotions, and responsibilities given to similarly situated white employees" and "assigned them duties not required of similarly situated white employees."  Ps. Resp. 1.  But in their response brief, the only adverse employment action they identify is their terminations.  *See* Ps. Br. 45 ("Because Plaintiffs' termination is clearly a 'materially adverse' employment action, the Court need only decide whether the Plaintiffs engaged in protected activity and whether a causal link exists between the protected activity and their termination.").  Because plaintiffs have failed to designate specific facts showing there is a genuine issue for trial on their other allegations, the court holds that BAE is entitled to summary judgment dismissing as grounds for an adverse employment action (1) BAE's failure to provide plaintiffs with job opportunities, training, promotions, and responsibilities, and (2) BAE's assignment of duties not required of similarly situated employees.

engaged in protected activity, and whether there is a causal link between the protected activity and their terminations in April 2011.

B

The court first considers whether plaintiffs have established that Johnson, Whitley, and Dominguez engaged in protected activity.

1

"[P]rotected activities include (1) opposing any practice deemed an unlawful employment practice (the 'opposition clause') or (2) making a charge, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing under Title VII (the 'participation clause')." *Armstrong v. K & B La. Corp.*, 488 Fed. Appx. 779, 781 (5th Cir. 2012) (per curiam) (citation omitted). Because no plaintiff participated in any investigation, proceeding, or hearing under Title VII relevant here, each plaintiff's case rests solely on the opposition clause. "To satisfy this opposition requirement, [a plaintiff] need only show that [he] had a 'reasonable belief that the employer was engaged in unlawful employment practices.'" *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 348 (5th Cir. 2007) (quoting *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 428 (5th Cir. 2000)). In other words, a plaintiff need not show that the practice complained of actually violated Title VII. *See Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 401 n.2 (5th Cir. 2013) (noting that the standard is "reasonable belief" despite language of 42 U.S.C. § 2000e-3(a)).

_____

Accordingly, the only basis for finding that an adverse employment action occurred is plaintiffs' terminations in April 2011.

- 29 -

BAE argues that plaintiffs have failed to establish that Johnson, Whitley, and Dominguez engaged in protected activity because they did not actually oppose any employment practice at BAE, and, even if they did, they could not have reasonably believed that BAE was engaged in an unlawful employment practice.  Plaintiffs respond that Johnson, Whitley, and Dominguez all engaged in protected activity when they complained, at various times, to Clarkson, Atherholt, and Briggs about their coworkers' use of racially derogatory language and the hostile treatment of minority FSRs in the motor pool at BAE.  BAE replies that none of these complaints, if made at all, was based on an objectively reasonable belief that BAE was engaged in an unlawful employment practice under Title VII.

2

The court first considers whether plaintiffs have established that Johnson opposed an unlawful employment practice at BAE.  Plaintiffs rely on four instances of protected activity.  First, they cite evidence that Johnson sent a September 2010 email to Briggs, Clarkson, and Atherholt complaining about the use of racially derogatory language in the motor pool at BAE.  Second, they cite evidence that Johnson and Clarkson had a telephone conversation "around the same time" as the September 2010 email during which Johnson complained that Brewer was using the "N-word" at work.  D. App. 442.  Third, they assert that Johnson complained in 2009 that minority FSRs were being excluded from meetings.  Fourth, they cite evidence that Johnson complained to a coworker named Charles Martin ("Martin") about the use of racially derogatory language at BAE.

The court holds that the first and second instances qualify as protected activity, but

that the third and fourth instances do not. The first and second instances qualify as protected activity because there is sufficient evidence from which a reasonable trier of fact could find that the September 2010 email and contemporaneous telephone conversation were complaints that BAE was engaged in an unlawful employment practice under Title VII because it permitted the ongoing use of racially derogatory language in the workplace. *See, e.g., Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 914 (8th Cir. 2006) (holding that reporting instances of coworker's use of racially derogatory language to supervisor is protected activity).

By contrast, the third instance does not qualify as protected activity because plaintiffs have not adduced competent summary judgment evidence to support their conclusory assertion. They cite two passages from Johnson's deposition and two passages from Joyce's deposition. *See* Ps. Br. 37 n.281. None of these passages adequately describes the complaint, and it is unclear whether the activity described in Johnson's deposition even relates to the same underlying activity as that described in the passages from Joyce's deposition. In the argument section of their brief, plaintiffs do not provide any further detail or otherwise explain why this conduct qualifies as protected activity. *See id.* at 46. The court is not obligated to comb the record in search of evidence that will permit a nonmovant to survive summary judgment. *See, e.g., Arrieta v. Yellow Transp., Inc.*, 2008 WL 5220569, at *2 n.3 (N.D. Tex. Dec. 12, 2008) (Fitzwater, C.J.); *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Accordingly, BAE is entitled to summary judgment dismissing this basis for Johnson's retaliation claim.

Nor does the fourth instance qualify as protected activity.  In their response, plaintiffs neither provide detail about the nature of the complaint nor evidence that BAE had knowledge of Johnson's complaint to Martin.  This type of vague, informal complaint to a coworker cannot establish that BAE was on notice of an allegedly unlawful employment practice, and thus cannot support plaintiffs' assertion that Johnson engaged in protected activity when he complained to Martin.  *See Williams v. Barnhill's Buffet Inc.*, 290 Fed. Appx. 759, 763 (5th Cir. 2008) (per curiam) (noting that "informal complaints to co-workers were insufficient" to put defendant on notice of need to address situation).  BAE is therefore entitled to summary judgment dismissing this basis for Johnson's retaliation claim.

The court's conclusion that the third and fourth instances do not qualify as protected activity is reinforced by Johnson's own deposition testimony.  During his deposition, Johnson testified:

| | |
|---|---|
| Counsel: | Now, backing up just a little bit, when you were employed with BAE did you ever make any complaints about race discrimination? |
| Johnson: | Yes. |
| Counsel: | When did you make any complaints about race discrimination? |
| Johnson: | 2010, about in September some time frame I made a complaint. |

D. App. 441.  Johnson then clarified that the "complaint" was made "in or [around] September 2010," and the only complaints made around that time were the September 2010

email and the telephone conversation about Brewer's remarks.[10]  *See id.* at 442.

Thus the court holds that plaintiffs have created a genuine issue of material fact that Johnson opposed an unlawful employment practice when he sent his September 2010 email and participated in the contemporaneous telephone conversation with Clarkson.  The court concludes that plaintiffs have not created a genuine issue of material fact regarding their assertions that Johnson engaged in protected activity when he complained in 2009 that minority FSRs were being excluded from meetings, and when he complained to Martin about the use of racially derogatory language at BAE.  As a result, BAE is entitled to summary judgment dismissing the third and fourth predicates for Johnson's retaliation claim.

3

The court next considers whether plaintiffs have satisfied the opposition requirement as to Whitley.  In a single paragraph, plaintiffs cite five instances of protected activity.  First, they cite evidence that Whitley complained to Briggs about a performance review he received from Atherholt and about Atherholt's treatment of him generally.  Second, they cite evidence that Whitley complained to Joyce in 2010 about Atherholt's treatment of him.  Third, they cite evidence that Whitley complained to Clarkson twice, once in 2009 or 2010 and the other time in 2010, that Caucasian employees were misappropriating government and military property for their personal use.  Fourth, they cite evidence that Whitley complained

_____

[10]During this part of his deposition, Johnson also mentions his complaint to Martin, *see* D. App. 442, but as explained above, this complaint cannot satisfy the protected activity element because it was made to a coworker and there is no evidence that BAE was aware of it.

to Clarkson in 2009 that Trubee said, in the presence of four African-Americans, that he was "going to pull [his] whip out and make [them get] to work."  D. App. 601.  Fifth, they cite evidence that Whitley complained to Clarkson in 2009 that Swoda repeatedly used the phrase "dumb-ass Mexican."[11]  *Id.* at 607.

The court holds that the first three instances do not qualify as protected activity, but that the fourth and fifth do.  The first three instances do not qualify because they are not complaints about conduct protected by Title VII.  In the first, Whitley complained that Atherholt's performance review was unfairly harsh and that Atherholt had failed to give him sufficient notice during his mid-year review that he considered aspects of his job performance deficient.  *See id.* at 582-83.  In the second, Whitley explicitly testified that he did *not* complain to Joyce that Atherholt was treating him in a racially discriminatory way. *Id.* at 589.  In the third, Whitley's complaint was about the misappropriation of government or military property, which is not protected activity under Title VII.  Because none of these complaints challenges conduct that violates Title VII, they fail to qualify as protected activity.  *See, e.g., Harris-Childs v. Medco Health Solutions, Inc.*, 169 Fed. Appx. 913, 916 (5th Cir. 2006) (per curiam) (affirming summary judgment for defendant on retaliation claim

---

[11]The summary judgment briefing and record are unclear as to whether Whitley made multiple complaints to Clarkson about Swoda's use of racially derogatory language. Whitley's deposition testimony can fairly be read as evidence that Whitley complained to Clarkson about Swoda on multiple, distinct occasions.  *See* D. App. 606-07.  Viewing the evidence this way, it is clear, however, that both complaints occurred in 2009 and that both referred to Swoda's use of the phrase "dumb-ass Mexican."  Given the overlapping nature of the subject matter and apparent temporal proximity, the court refers to these complaints collectively as one "instance" of opposition activity.

where plaintiff complained of harassment generally but did not complain of harassment based on protected characteristic); *Moore v. United Parcel Serv., Inc.*, 150 Fed. Appx. 315, 319 (5th Cir. 2005) (per curiam) (affirming summary judgment for defendant on retaliation claim where plaintiff's grievance complained of unfair treatment but did not mention race discrimination); *see also Tratree v. BP N. Am. Pipelines, Inc.*, 277 Fed. Appx. 390, 395 (5th Cir. 2008) (per curiam) ("Complaining about unfair treatment without specifying why the treatment is unfair . . . is not a protected activity.") (age discrimination claim).  Accordingly, BAE is entitled to summary judgment dismissing these predicates for Whitley's retaliation claim.

The fourth and fifth instances, however, do qualify as opposition activity because they are race-related.  In both instances, Whitley complained to a BAE supervisor that a coworker was using racially derogatory language at work.  Trubee's comment that he would whip employees if they did not get to work is facially race-neutral, but when viewed in context, a reasonable trier of fact could infer a racial connotation because he made the comment in the presence of four African-Americans. *Cf., e.g., Johnson v. Potter*, 177 F.Supp.2d 961, 965 (D. Minn. 2001) (discussing racial connotation of whipping in context of hostile work environment claim).  Swoda's comments are patently racist.  Because these complaints were instances where Whitley complained to a BAE supervisor about the use of racially derogatory language, plaintiffs have adduced sufficient evidence from which a reasonable trier of fact could find that Whitley opposed an unlawful employment practice at BAE. *See, e.g., Willis v. Cleco Corp.*, ___ F.3d ____, 2014 WL 1379103, at *3-4 (5th Cir. Apr. 8, 2014)

(noting that plaintiff engaged in protected activity by reporting coworker's comments that African-Americans were "dumb" and "lazy").

Thus the court holds that plaintiffs have created a genuine issue of material fact that Whitley opposed an unlawful employment practice when he complained to Clarkson about Trubee's comment and when he complained to Clarkson about Swoda's comments.[12]   The court holds, by contrast, that plaintiffs have not created a genuine issue of material fact that Whitley engaged in protected activity when he complained (1) to Briggs about Atherholt's performance review and general attitude toward him, (2) to Joyce about the way Atherholt treated him, and (3) to Clarkson about coworkers misappropriating government or military property.   As a result, BAE is entitled to summary judgment dismissing these three predicates for Whitley's retaliation claim.

4

The court now turns to whether plaintiffs have satisfied the opposition requirement as to Dominguez.   Plaintiffs rely on four instances of protected activity.   First, they cite evidence that Atherholt told Dominguez that his request for a piece of equipment was "so ghetto."   D. App. 361.   Second, they cite evidence that Dominguez complained to Joyce

---

[12]During his deposition, Whitley testified that he did not "make a complaint of unlawful discrimination or harassment based on [his] race" while at BAE. D. App. 581. But during the line of questioning that followed, he testified that he *did* complain of "retaliation" while he was an employee. *Id.* at 581-82. When read in context, it is clear that Whitley's complaint was about a racially hostile work environment, not retaliation. That he mislabeled the nature of his complaint is immaterial, because Title VII's opposition requirement does not require that the plaintiff correctly describe the allegedly unlawful employment practice. *Cf. Turner*, 476 F.3d at 348.

about the treatment of minority employees in the motor pool.  Third, they cite evidence that Dominguez gathered statements from other employees about Swoda's use of racially derogatory language and presented the statements to Clarkson.  Fourth, they cite evidence that Dominguez informed a group of contractors that racism in the workplace would not be tolerated.

The court holds that none of these four instances qualifies as protected activity.  As to the first instance, plaintiffs have not presented any evidence that Dominguez complained to anyone at BAE about Atherholt's use of the phrase "that's so ghetto."  The cited deposition testimony only establishes that Atherholt made this comment in an email he sent to Dominguez, and that later, when Atherholt met Dominguez in person for the first time, Atherholt referred to Dominguez as the person with whom he "had . . . the 'that's so ghetto conversation.'"  *Id.*  Plaintiffs have not adduced any evidence that Dominguez opposed this remark.

The second instance—that Dominguez complained to Joyce about the treatment of minority employees in the motor pool—is not protected activity because the complaint did not oppose a practice prohibited by Title VII.  During his deposition, Dominguez described his complaint to Joyce in this way:

> I told [Joyce] that I didn't understand our mission there.  They told the guys . . . to not talk to us, not to listen to any technical advice we had to offer them.  We weren't part of any of their maintenance meetings. . . .  We're completely out of the loop here, you know. . . .  I just told [Joyce] . . . it's not what we're used to.  We're used to—you know, a BAE environment [where] everybody is helpful, good morning, you know, those

- 37 -

> types of things, and there was none of that there.  I mean, it was
> like—the vibe was there that they doesn't want us there.

*Id.* at 363 (alterations added, paragraph break omitted).  He subsequently clarified this point:

| Counsel: | In your conversation with . . . Joyce, did you mention anything about race or national origin or minorities? |
| --- | --- |
| Dominguez: | No. |
| Counsel: | So you never said, we think we're being treated this way because we're minorities? |
| Dominguez: | No.  I said we weren't being treated fairly like everybody else does. |

*Id.*  This type of vague complaint about unfair treatment, which does not identify any

protected characteristic under Title VII, does not qualify as protected activity.  *See, e.g.,*

*Tratree*, 277 Fed. Appx. at 395.

The third instance—that Dominguez gathered statements about Swoda's use of

racially derogatory language and presented them to Clarkson—avoids the two problems

identified above, but the underlying deposition testimony relied on to support this assertion

is taken out of context.  Plaintiffs cite an excerpt from Dominguez's deposition in which he

testified that he brought to Clarkson a statement written by an employee named Travis Cano

("Cano"), in which Cano accused Swoda of calling another employee, Henry Bostic, a "ni---

r."  *See* D. App. 384.  When asked what he did with this statement, Dominguez testified:

"And I took the statement, and I presented it to [Clarkson].  I told him, look, this is not a

healthy work environment."  *Id.*  Read in isolation, this testimony appears to be evidence that

Dominguez opposed an unlawful employment practice at BAE.  But when read in context, it is clear that Dominguez did not actually oppose anything he thought to be an unlawful employment practice at the time.  In the next portion of his deposition testimony, which plaintiffs do not address, Dominguez explained:

| | |
|---|---|
| Counsel: | And did you ever speak to . . . Briggs about the statement you received from [Cano]? |
| Dominguez: | No. |
| Counsel: | Did you ever take that statement to human resources? |
| Dominguez: | No. |
| Counsel: | And did you take that statement to anyone other than giving it to . . . Clarkson, who you said he was going to give it to . . . Briggs? |
| Dominguez: | No, I just gave it to . . . Clarkson. |
| Counsel: | And why—are you suggesting that you were retaliated against for this? |
| Dominguez: | For? |
| Counsel: | For taking this statement from [Cano] and giving it to . . . Clarkson? |
| Dominguez: | *No.*  I said I was—I felt that I was targeted because I associated with blacks on the job and made it known that I did not care for racism, racist attitudes. |

*Id.* at 385 (emphasis added).  Dominguez also testified:

| | |
|---|---|
| Counsel: | What makes you think that . . . Clarkson would retaliate against you just because you associated |

with the other four named plaintiffs?

Dominguez:   It's just the feeling that I got when I was around him.

Counsel:   Did he ever say anything to give you that impression?

Dominguez:   No.

*Id.* at 385-86.  And, most important, Dominguez testified:

Counsel:   So during your entire tenure at BAE . . ., you never complained to anyone about anything you thought to be racially hostile or discriminatory?

Dominguez:   I was only there five years, and, *no.*

Counsel:   And during your entire time at [BAE], you never made any internal complaint about anything you thought to be discrimination?

Dominguez:   *No.*

*Id.* at 367 (emphasis added).

When read in context, and especially coupled with his more specific and explicit testimony that he never complained to anyone about anything he thought to be racially hostile or discriminatory, Dominguez's testimony that he gathered statements about Swoda's use of racially derogatory language and presented them to Clarkson cannot support a reasonable trier of fact's finding that Dominguez opposed an unlawful employment practice while at BAE, because (1) Dominguez did not consider his taking of the statement to Clarkson to be a complaint about a racially hostile work environment or discrimination, (2) he did not follow up with HR or anyone else at BAE, and (3) he admitted during his

- 40 -

deposition that he was not suggesting that he was retaliated against because he took this statement to Clarkson.  Given that he was clearly and explicitly asked whether he complained to anyone about anything he thought to be racially hostile or discriminatory while he was at BAE, and that he answered clearly and explicitly "no," plaintiffs' attempt to generate a material fact issue by taking other deposition testimony out of context fails.

The fourth instance—that Dominguez informed a group of contractors that racism in the workplace would not be tolerated—likewise fails to qualify as protected activity. Plaintiffs cite deposition testimony in which Dominguez testified that he addressed a group of contractors, telling them that racism in the workplace would not be tolerated. *See id.* at 384-85.  Although he recalled the names of specific *contractors* who were there, he could not recall whether there were any BAE employees present.  He did recall, and stated explicitly, that neither Briggs nor Clarkson was present.  He also testified that he informed Clarkson that the meeting had occurred after it was completed, but he clarified that he was not suggesting that Clarkson retaliated against him for addressing the contractors in this manner.  Because this evidence does not establish that Dominguez complained to anyone at BAE about the situation (or ask that something be done), it cannot constitute opposition activity because it did not put BAE on notice that a problem needed to be addressed.  *See, e.g., Williams*, 290 Fed. Appx. at 763.

Thus the court holds that plaintiffs have failed to create a genuine issue of material fact that Dominguez opposed an unlawful employment practice while at BAE.  As a result, plaintiffs have failed to establish that Dominguez engaged in protected activity and have

therefore failed to establish a prima facie case of retaliation.  Accordingly, BAE is entitled to summary judgment dismissing the retaliation claim brought by Dominguez.

5

Because plaintiffs have produced sufficient evidence that Johnson and Whitley opposed what they considered to be unlawful employment practices at BAE, the court next considers whether a reasonable trier of fact could find that their beliefs were reasonable. BAE contends that neither Johnson nor Whitley can satisfy the objective reasonable belief standard because no one could have reasonably believed that the underlying activity of which they complained amounted to a violation of Title VII.  Plaintiffs respond that Johnson and Whitley reasonably believed that the underlying activity was unlawful because they complained of multiple racially derogatory comments made by several different coworkers over a prolonged period of time.  BAE replies that these were, at most, isolated remarks that would not come close to establishing a viable hostile work environment claim.

Viewing the evidence in the light most favorable to plaintiffs and drawing all reasonable inferences in their favor, the court concludes that plaintiffs have produced evidence that is sufficient to satisfy the reasonable belief standard as to both instances of Johnson's opposition activity and both instances of Whitley's opposition activity.

In his September 2010 email to Briggs, Clarkson, and Atherholt, Johnson complained that several different coworkers, including Atherholt (one of the supervisors), used racial epithets at work, such as the "N word."  During his telephone conversation with Clarkson, which occurred around the same time, Johnson complained that a contractor had used the "N

- 42 -

word" at work.[13]

Both of Whitley's complaints occurred in 2009.  When Whitley complained to Clarkson about Trubee's use of racially derogatory language, he complained that Trubee told four African-Americans that he would whip them if they did not get to work.  When he complained to Clarkson about Swoda's comments, he complained that Swoda repeatedly referred to a Hispanic coworker as a "dumb-ass Mexican."

BAE argues that none of these complaints can satisfy the reasonable belief standard because the underlying comments of which Johnson and Whitley complained would not come close to establishing a viable hostile work environment claim.  In support of this position, BAE relies principally on two cases, both of which are distinguishable.  In *Turner* the plaintiff complained that her supervisor told her that she worked with "ghetto children" during her volunteer service.  *Turner*, 476 F.3d at 342.  The Fifth Circuit held that the plaintiff could not have reasonably believed that the supervisor's comments constituted an unlawful employment practice.  *See id.* at 348-49.  Here, by contrast, the comments of which Johnson and Whitley complained were more extreme, especially Swoda's use of the word

---

[13]The court does not suggest that this telephone conversation would alone satisfy the protected activity element because it referred to a single remark by a single contractor.  *Cf. Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 959-60 (11th Cir. 1997) (holding that complaint of single remark by single coworker was insufficient to establish protected activity); *Silver v. KCA, Inc.*, 586 F.2d 138, 140-43 (9th Cir. 1978) (same).  But here, Johnson made the complaint at the same time he complained of the use of racially derogatory language by other BAE employees and contractors, and a reasonable trier of fact could find that the telephone conversation and the email were collectively part of one instance of protected activity.

"ni---r."  And they referred to members of the workforce.

In *Jordan v. Alternative Resources Corp.*, 458 F.3d 332 (4th Cir. 2006), the plaintiff complained that a fellow employee watching a newscast about the capture of two suspected black snipers had stated: "They should put those two black monkeys in a cage with a bunch of black apes and let the apes f--k them."  *Jordan*, 458 F.3d at 336 (internal quotation marks omitted, alteration added).  The Fourth Circuit held that the plaintiff could not have reasonably believed that the coworker's racist exclamation gave rise to a viable hostile work environment claim.  *See id.* at 341.  The instant case is distinguishable because the conduct of which Johnson complained was not an isolated statement by a single individual, but rather multiple racial slurs, by several different individuals, over a more prolonged period, and they were directed at employees in the workplace.  And unlike in *Jordan*, Johnson alleges that a supervisor, not merely a coworker, used racially derogatory language.  Whitley's complaints are distinguishable as well.  Swoda's comments, for example, were repeated—not a single, isolated exclamation—and they were also directed at an employee in the workplace.

More generally, BAE is attempting to graft onto the reasonable belief standard a more stringent requirement than the standard imposes.  The panel's decision in *Stewart v. RSC Equipment Rental, Inc.*, 485 Fed. Appx. 649 (5th Cir. 2012) (per curiam), is instructive.  In *Stewart* the plaintiff complained to his supervisor twice: once, when he complained that he had been treated less favorably than a Caucasian coworker, and a second time, when he complained that a coworker had spat into his lunch, and about certain computer problems, which he alleged were instances of discrimination.  *Id.* at 652.  The district court held that

neither complaint constituted a protected activity, but the Fifth Circuit disagreed:

> [The plaintiff's] comments to [his supervisor] . . . suffice as opposition to racial discrimination.  They were sarcastic but were clearly claims of racial discrimination.  We must, therefore, disagree with the district court's conclusion that these were not protected activities.  We also reject [the defendant's] suggestion that these complaints . . . did not reference conduct that could "plausibly be considered discriminatory."

*Id.* at 653 (quoting *Turner*, 476 F.3d at 349).  Notably, the court held that each complaint constituted protected activity even though the first one was made sarcastically, neither complaint included an explicit demand for the employer to correct the problem, and the underlying complained-of activity would have fallen well short of satisfying the standard for a hostile work environment.  *Cf. Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 328 (5th Cir. 2009) ("A hostile work environment exists 'when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)).  Johnson and Whitley complained of conduct in the workplace that was more severe and pervasive than the conduct complained about in *Stewart*.  Even if none of these allegations would suffice to make out a viable hostile work environment claim, Johnson and Whitley could have reasonably believed that the underlying activity—e.g., BAE's tolerance of racially derogatory language in the workplace—constituted an unlawful employment practice under Title VII.  Plaintiffs have therefore made a prima facie showing that Johnson and Whitley engaged in protected activity under the opposition clause.

C

The court next considers whether plaintiffs have made a prima facie showing of a causal connection between Johnson's September 2010 complaints and his April 2011 termination, and Whitley's 2009 complaints and his April 2011 termination.

The standard for satisfying the causation element at the prima facie stage is "much less stringent" than the "but for" causation that a jury must find. *Montemayor v. City of San Antonio*, 276 F.3d 687, 692 (5th Cir. 2001); *see also Khanna v. Park Place Motorcars of Hous., Ltd.*, 2000 WL 1801850, at *4 (N.D. Tex. Dec. 6, 2000) (Fitzwater, J.) (characterizing prima facie burden as "minimal"). An employee "must produce at least some evidence that the decisionmakers had knowledge of his protected activity." *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 883 n.6 (5th Cir. 2003). "Close timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a prima facie case of retaliation." *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997) (quoting *Armstrong v. City of Dallas*, 997 F.2d 62, 67 (5th Cir. 1993)).

BAE argues that plaintiffs have failed to produce sufficient evidence of a causal connection. In response, plaintiffs present three types of evidence. First, plaintiffs rely on the temporal proximity between the protected activity and the adverse employment action. Johnson's complaints occurred in September 2010. He was terminated in April 2011, approximately six to seven months after engaging in the protected activity. Whitley's complaints occurred even earlier, sometime in 2009, and he was also terminated in April 2011—approximately two years after he made the complaints. Standing alone, the six- or

seven-month period likely would not be sufficient evidence from which to infer a causal connection,[14] and the two-year period definitely would not be sufficient. But as discussed below, it is not the only evidence that plaintiffs present in support of this element.

Second, plaintiffs rely on a series of remarks allegedly made by Clarkson and Atherholt in response to several of Whitley's complaints, and Clarkson's and Atherholt's "apparent disregard" of the complaints. Ps. Br. 46. For example, plaintiffs have produced evidence that, when Whitley complained to Clarkson about Swoda's use of racially derogatory language, Clarkson ignored his complaints and simply "smiled and walk[ed] away." D. App. 607. Although this evidence, standing alone, likely would not be sufficient evidence from which to infer a causal connection, it is not the only evidence that plaintiffs present in support of this element.

Third, plaintiffs rely on "Clarkson's own racial hostility," Ps. Br. 46, and they refer to the evidence discussed above that BAE's stated legitimate, nondiscriminatory reason for plaintiffs' terminations is pretextual. Because the court has concluded that a reasonable trier of fact could find based on this evidence that the RIF is pretextual, plaintiffs have satisfied the "less stringent" causation requirement of the prima facie case as to Johnson and Whitley.

---

[14]Although there is no bright line rule for determining when the temporal proximity between the protected activity and the adverse employment action is close enough to establish a causal connection, the Supreme Court has stated that it must be "very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citation and internal quotation marks omitted). The Fifth Circuit "has found, for example, that . . . a five month lapse is not close enough without other evidence of retaliation." *Feist v. La. Dep't of Justice, Office of the Attorney Gen.*, 730 F.3d 450, 454 (5th Cir. 2013) (citing *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 472 (5th Cir. 2002)).

Thus the court holds that plaintiffs have made a prima facie showing of a causal connection between Johnson's September 2010 complaints and his April 2011 termination, and Whitley's 2009 complaints and his April 2011 termination. They have therefore satisfied all three elements of the prima facie case of retaliation as to Johnson and Whitley.

D

Because plaintiffs have established a prima facie case of retaliation as to Johnson and Whitley, the burden shifts to BAE to articulate a legitimate, nondiscriminatory reason for the adverse employment action. As discussed above, BAE contends that the termination occurred as part of a RIF that was necessitated by a decrease in demand for M9 ACE vehicle work and a corresponding shift in demand for BAE's support services. BAE has carried its burden of production, so the burden shifts to plaintiffs to produce sufficient evidence to create a genuine issue of material fact that BAE's reason is pretextual. As discussed above, plaintiffs have carried this burden because they have produced evidence from which a reasonable trier of fact could find that the RIF is a pretext for discrimination against Johnson and Whitley.

E

Accordingly, BAE's motion for summary judgment as to plaintiffs' retaliation claim is granted in part and denied in part. It is granted as to the retaliation claim brought by plaintiffs on behalf of Dominguez because they have failed to satisfy the first element of a prima facie case. It is denied as to plaintiffs' retaliation claim brought on behalf of Johnson to the extent it is based on Johnson's September 2010 email, his contemporaneous telephone

conversation with Clarkson, and his termination.  It is granted as to all other allegations of protected activity and adverse employment actions regarding Johnson.  *See supra* note 9.  It is denied as to plaintiffs' retaliation claim brought on behalf of Whitley to the extent it is based on Whitley's 2009 complaints about Trubee's "whip" comment and Swoda's use of the phrase "dumb-ass Mexican."  It is granted as to all other allegations of protected activity and adverse employment actions regarding Whitley.  *See id.*

V

The court now considers BAE's motion for summary judgment addressing plaintiffs' request for punitive damages.

A

BAE contends that plaintiffs cannot establish that it acted with malice or reckless disregard for plaintiffs' right to be free from unlawful discrimination or retaliation, and that it cannot be held vicariously liable for the discriminatory or retaliatory employment decisions of managers when those decisions were contrary to BAE's good faith efforts to comply with the law.  Plaintiffs respond that they have produced evidence that BAE, through its agents, acted with malice or reckless indifference to their federally protected rights.

"A Title VII plaintiff may recover punitive damages upon proof that the defendant acted 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'"  *EEOC v. Boh Bros. Const. Co.*, 731 F.3d 444, 467 (5th Cir. 2013) (en banc) (quoting 42 U.S.C. § 1981a(b)(1)).  "This is a higher standard than the showing necessary for compensatory damages, satisfied in 'only a subset of cases involving

intentional discrimination.'" *Id.* (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534 (1999)). "Thus, 'not every sufficient proof of pretext and discrimination is sufficient proof of malice or reckless indifference.'" *Id.* (quoting *Hardin v. Caterpillar, Inc.*, 227 F.3d 268, 270 (5th Cir. 2000)). "Moreover, even if particular agents acted with malice or reckless indifference, an employer may avoid vicarious punitive damages liability if it can show that it made good-faith efforts to comply with Title VII." *Id.* (citing *Kolstad*, 527 U.S. at 545-46).

B

The court denies BAE's motion for summary judgment in this respect. BAE's contention relies principally on its assertion that the undisputed evidence "shows that it undertook good faith efforts to comply with Title VII." D. Br. 49. But there are material fact issues that preclude summary judgment on this basis because there is evidence that BAE did not follow the nondiscrimination policy it had in place, and that members of HR subjectively perceived that the RIF violated federal law because it would have a disparate impact on minority employees. *See Boh Bros.*, 731 F.3d at 468 (noting that relevant standard is whether employer discriminates in the face of "perceived risk" that its actions will violate federal law). The court concludes that this issue involves factual components that must be resolved at trial.[15]

---

[15]*See supra* note 7. "When this court denies rather than grants summary judgment, it typically does not set out in detail the evidence that creates a genuine issue of material fact." *Valcho*, 658 F.Supp.2d at 812 n.8.

VI

The court next considers BAE's *Daubert*-type motions:[16] to strike the expert testimony of Dr. John Michael ("Dr. Michael"), and to strike the expert testimony of Dr. Ricardo Ainslie ("Dr. Ainslie").

"The court decides these motions in its role as gatekeeper under Fed. R. Evid. 702." *SEC v. Cuban*, 2013 WL 3809654, at *1 (N.D. Tex. July 23, 2013) (Fitzwater, C.J.) (citing *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002)) (citation omitted). "The court may admit proffered expert testimony only if the proponent, who bears the burden of proof, demonstrates that (1) the expert is qualified, (2) the evidence is relevant to the suit, and (3) the evidence is reliable." *Nunn v. State Farm Mut. Auto. Ins. Co.*, 2010 WL 2540754, at *2 (N.D. Tex. June 22, 2010) (Fitzwater, C.J.) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)).

The first requirement is that the expert be qualified. "Before a district court may allow a witness to testify as an expert, it must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'" *United States v. Cooks*, 589 F.3d 173, 179 (5th Cir. 2009) (quoting Rule 702). "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Id.* (citing *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)). "Rule 702 does not mandate that an expert be highly

---

[16]*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

qualified in order to testify about a given issue.  Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (citation omitted).

The second requirement is that the expert's testimony be relevant.  To be relevant, "expert testimony [must] 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Pipitone*, 288 F.3d at 245 (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993)).  "Relevance depends upon 'whether [the expert's] reasoning or methodology properly can be applied to the facts in issue.'" *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quoting *Daubert*, 509 U.S. at 593); *see also* Rule 702(d) (requiring that "expert has reliably applied the principles and methods to the facts of the case").

The third requirement is that the expert's testimony be reliable.  "Reliability is determined by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid.'" *Knight*, 482 F.3d at 352 (quoting *Daubert*, 509 U.S. at 592-93); *see also* Rule 702(c) (requiring that "testimony [be] the product of reliable principles and methods").  Expert testimony "must constitute 'more than subjective belief or unsupported speculation.'" *Nunn*, 2010 WL 2540754, at *2 (quoting *Daubert*, 509 U.S. at 590).  The court focuses on the expert's methodology, not the conclusions generated by it. *Id.* at *4 (citing *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997)).  If, however, "there is simply too great an analytical gap between the [basis for the expert opinion] and the opinion proffered," the court may exclude the testimony as unreliable. *Gen. Elec. Co. v. Joiner*, 522

U.S. 136, 146 (1997); *see also Johnson v. Arkema, Inc.*, 685 F.3d 452, 460-61 (5th Cir. 2012); *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 278-79 (5th Cir. 1998).  This review is usually conducted by considering the five nonexclusive *Daubert* factors.[17]  But these factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of [the] testimony."  *Kumho*, 526 U.S. at 150.

The burden is on the proponent of the expert testimony to establish its admissibility by a preponderance of the evidence.  *See Daubert*, 509 U.S. at 592 n.10; *see also Johnson*, 685 F.3d at 459.  The court's inquiry is flexible in that "[t]he relevance and reliability of expert testimony turns upon its nature and the purpose for which its proponent offers it." *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010) (citation omitted).  "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [trier of fact's] consideration."  *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596; *Nunn*, 2010 WL 2540754, at *5.

---

[17]The five nonexclusive *Daubert* factors are: (1) whether the expert's technique can be or has been tested; (2) whether the method has been subjected to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community.  *Daubert*, 509 U.S. at 593-94.

VII

The court turns first to BAE's motion to strike the testimony of Dr. Michael.

A

Plaintiffs intend to call Dr. Michael to offer several opinions about the statistical significance of BAE's RIF with respect to "persons of color," and the alleged redundancy and subjectivity of the RIF spreadsheet's performance-rating criteria.[18]   Pertinent to this motion, Dr. Michael opines that "[t]he percentage of Persons of Color involuntarily terminated (83%) is significantly greater than that for Other Persons (4%).  This difference is highly statistically significant, and cannot be explained by chance alone."[19]  D. 10/5/2013 App. 2 (the "statistical significance opinion").  He also opines that "[i]f the weighting scheme [were] equal and retrospective, the average scores for Persons of Color compared to that of Others is not statistically different."  *Id.* (underlining omitted) (the "weighting opinion").  Finally, he opines that "[t]he two factors, (Total Skill Sets & Competencies), and

---

[18]In their response, plaintiffs explicitly state that they do not intend to offer Dr. Michael's opinion that the weighting scheme used by BAE is "unusual" and "appears to be calculated to disadvantage persons of color," and whether the performance measures were tainted by discriminatory animus.  *See* Ps. 1/30/2014 Resp. 1.  The court denies as moot BAE's motion to strike Dr. Michael's testimony as to these opinions and does not reach BAE's arguments concerning them.  Should plaintiffs attempt to offer either opinion at trial, BAE may object.

[19]In his deposition, Dr. Michael testified that the 83% figure is an error, and that the correct figure is 71%.  He also testified that he based his opinion on the 71% figure.  *See* D. 10/5/2013 App. 33.  In their response, plaintiffs argue that because DeShong was never terminated, only six plaintiffs were terminated (not seven), and the 83% figure is therefore the correct one.  The court notes that nothing in this opinion hinges on the difference between these two figures.  At trial the parties will have the opportunity to address this dispute.

(Professionalism, Ethical Conduct, Results Oriented), have definitions that are ambiguous, poorly defined, esoteric, and substantially subsumed by the criteria in another factor: Performance and Outcome Total, thereby rendering these two factors redundant." *Id.* (the "defective factor opinion").

BAE contends on the following grounds that Dr. Michael's statistical significance opinion is unreliable: (1) it is based on a sample size that is too small, (2) his analysis does not control for other possible causal factors, and (3) his methodology has not been subject to testing, peer review, publication, or a rate-of-error analysis, and it has not gained general acceptance. BAE argues that Dr. Michael's weighting opinion is confusing, irrelevant, and unhelpful to the trier of fact. And BAE maintains that his defective factor opinion is not based on sufficient facts or data and does not help the trier of fact understand the evidence or determine a fact in issue.[20] Plaintiffs oppose the motion.

## B

The court first considers BAE's motion as to Dr. Michael's statistical significance opinion. BAE argues, first, that this opinion is unreliable because it is based on a sample size

---

[20]In its motion, BAE makes the conclusory assertion that Dr. Michael "lacks proper qualification to testify as an expert." D. 10/5/2013 Mot. 1. But in its brief, BAE does not advance any argument about Dr. Michael's qualifications. In fact, BAE concedes in its reply that it "does not take issue with [Dr.] Michael's qualifications as a statistician." D. 2/13/2014 Reply Br. 3. It is undisputed that Dr. Michael has a Ph.D. in Statistical Science from Southern Methodist University and a Ph.D. in Industrial-Organizational Psychology from The George Washington University. It is also undisputed that he has served as an expert in over 100 cases and has provided expert testimony in 34 of those cases, assisting attorneys for plaintiffs and defendants in approximately equal numbers. Accordingly, the court finds no basis in the record to question Dr. Michael's qualifications.

that is too small (32 individuals, which comprised the group of FSRs and Sr. FSRs who were considered in the RIF) to yield reliable statistical conclusions. "Whether a sample is too small . . . is a determination made by the district court on a case-by-case basis." *Anderson v. Douglas & Lomason Co.*, 26 F.3d 1277, 1289 n.20 (5th Cir. 1994) (citing *Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 995 n.13 (1988); *Rendon v. AT&T Techs.*, 883 F.2d 388, 397 (5th Cir. 1989)). BAE focuses on the size of the sample but does not address Dr. Michael's actual methodology, which is designed to mitigate the problems posed by analyzing small samples. In fact, Dr. Michael's analysis is based on a Fisher's Exact Test, which "is an accepted methodology in discrimination cases." *Perez v. Pavex Corp.*, 510 F.Supp.2d 755, 762 (M.D. Fla. 2007); *see also Matthews v. Waukesha County*, 937 F.Supp.2d 975, 986 (E.D. Wis. 2013) (noting that Fisher's Exact Test is a "well known small-sample technique" (alteration, citations, and internal quotation marks omitted)); *Currier v. United Techs. Corp.*, 326 F.Supp.2d 145, 154-56 (D. Me. 2004) (admitting statistical analysis in RIF case where expert looked at effect that RIF had on defendant's workforce using Fisher's Exact Test); *Reference Manual on Scientific Evidence* 255 n.108 (3d ed. 2011) (noting that Fisher's Exact Test is "[w]ell-known small-sample technique"). Because BAE does not challenge the accuracy of the underlying data, nor does it argue that Fisher's Exact Test is an unreliable methodology as applied to these facts, the court declines to strike Dr. Michael's statistical significance opinion on the ground that the underlying sample size is too small.

        BAE also contends that this opinion is unreliable because Dr. Michael's analysis does

not control for other possible causal factors.  In support, BAE relies on a line of cases that explains the general principle that correlation does not imply causation.  *See, e.g., Valencia*, 600 F.3d at 425 ("Evidence of mere correlation, even a strong correlation, is often spurious and misleading when masqueraded as causal evidence, because it does not adequately account for other contributory variables.").  This principle is inapposite here, because Dr. Michael is not attempting to opine that the statistical data *prove* causation.  Rather, he acknowledges in his expert report that "one cannot prove cause and effect with the analyses of observational data such as these," and explains that the statistical analysis supports the conclusion that chance alone does not explain the results of the RIF.  *See* D. 10/5/2013 App. 3.  "[W]here evidence of correlation itself is potentially relevant and unlikely to mislead the [trier of fact], an expert who reliably discerns this relationship can present such conclusions to the [trier of fact]."  *Valencia*, 600 F.3d at 425.  Here, Dr. Michael's statistical evidence is relevant and unlikely to mislead the trier of fact because he acknowledges the shortcomings of relying on observational data to prove causation and does not attempt to present this evidence as causal evidence that BAE discriminated against plaintiffs.  Accordingly, the court declines to strike Dr. Michael's statistical significance opinion on the ground that his analysis does not control for other causal factors.

BAE argues next that Dr. Michael's opinion is unreliable because it is based on a methodology that has not been subject to testing, peer review, publication, or a rate-of-error analysis, and because it has not gained general acceptance.  Other than its conclusory assertion to the contrary, BAE does not identify any specific problem with Dr. Michael's

methodology, and, as discussed above, Fisher's Exact Test is generally recognized by courts and statisticians as a reliable method of measuring probabilities when dealing with small samples. The test has, in fact, been subject to testing, peer review, and publication, and it has gained general acceptance in the academic community. The court therefore declines to strike Dr. Michael's statistical significance opinion on the ground that it is based on a methodology that has not been tested, reviewed, or generally accepted.

BAE argues next that Dr. Michael's opinion is irrelevant because it does not analyze a single, discrete employment practice taken by BAE. This argument lacks force. The RIF, which culminated in plaintiffs' terminations, is in fact a single, discrete employment practice. Moreover, Dr. Michael's analysis of the spreadsheet used to justify BAE's decision to terminate certain employees is relevant because it provides evidence to establish plaintiffs' prima facie case. BAE's reliance on disparate impact cases, such as *Bannister v. Dal-Tile Int'l, Inc.*, 2003 WL 21145739, at *2 (N.D. Tex. May 14, 2003) (Fish, C.J.), is misplaced because those cases apply a different standard, and plaintiffs' claim is not predicated on a disparate impact theory.[21]  *See* 42 U.S.C. § 2000e-2(k); *see also, e.g., Mayberry v. Mundy*

---

[21]In their response to BAE's motion to strike, plaintiffs appear to suggest that they should be entitled to pursue a disparate impact claim as well as a disparate treatment claim. The court disagrees. Plaintiffs did not plead such a claim in substance and, in fact, their second amended complaint does not even mention the words "disparate" or "impact." *See, e.g., Gambill v. Duke Energy Corp.*, 456 Fed. Appx. 578, 587 (6th Cir. 2012) (noting that complaint did not plead disparate impact theory and even lacked the words "disparate" or "impact"). Plaintiffs' response to summary judgment reinforces this conclusion, because it sets forth the elements of a prima facie case of intentional discrimination in a RIF case and posits that BAE's proffered legitimate, nondiscriminatory reason for plaintiffs' terminations is pretextual. *See* Ps. Br. 39-45, 48-50. It does *not* address the elements of a prima facie case

*Contract Maint. Inc.*, 197 Fed. Appx. 314, 316-17 (5th Cir. 2006) (per curiam) (setting forth elements of prima facie case of disparate impact discrimination).

Finally, BAE contends in its reply brief that Dr. Michael's opinion is unreliable because it is predicated on arbitrary racial classifications. Specifically, it posits that there is no principled basis for including African-Americans and Hispanics in one category—"persons of color"—and Caucasians and Asian-Americans in another category—"other." BAE did not present this argument in its opening brief. The court will not consider arguments first raised in a reply brief. *See, e.g., Conceal City, L.L.C. v. Looper Law Enforcement, LLC*, 917 F.Supp.2d 611, 623 (N.D. Tex. 2013) (Fitzwater, C.J.). This would effectively deny plaintiffs a fair opportunity to respond. *See, e.g., id.* The court therefore declines to strike Dr. Michael's opinion on this basis.[22]

## C

The court next turns to Dr. Michael's weighting opinion. BAE contends that this opinion is confusing, irrelevant, and unhelpful to the trier of fact because it is merely Dr. Michael's second-guessing a business's legitimate decision to evaluate performance in a certain way. The court disagrees. BAE explains that it weights certain scores in the RIF spreadsheet in this manner:

---

of disparate impact discrimination. Accordingly, the court concludes that Dr. Michael's statistical significance opinion is relevant to plaintiffs' prima facie case of *intentional* discrimination.

[22]BAE may, however, raise this objection at trial.

BAE uses a progressively weighted RIF model to determine an overall ranking score for each employee. The model is designed to give more emphasis to recent scores than to older scores. In the 2011 RIF at issue, each employee's performance score for 2008 accounted for 1/6 of the total score, 2009 accounted for 1/3 of the total score, and 2010 accounted for 1/2 of the total score.

D. 10/5/2013 Br. 8. Dr. Michael opines that, if this scheme were removed and each year's performance rating received the same relative weight, the difference in average scores between individuals in the "persons of color" category would not be statistically different from those for individuals in the "other" category. That BAE, as an employer, uses a weighting scheme that values recent performance higher than less recent performance is not of itself evidence of discrimination. But under the facts and circumstances of this case, where plaintiffs' theory is that Clarkson replaced Joyce in 2010 and had input during the spreadsheet revision process, Dr. Michael's testimony is relevant because it is proof that the values for which Clarkson had input (the 2010 performance scores) had the greatest effect on plaintiffs' overall performance ratings, and that, without the weighting scheme in place, there would have been no statistically significant differences between certain groups of employees considered for termination. At least for this purpose, Dr. Michael's opinion is relevant and based on a reliable methodology. *See Valencia*, 600 F.3d at 424 (noting that the relevance and reliability of expert testimony depends on purpose for which it is offered); *see also Tex. Instruments*, 100 F.3d at 1185-86 (collecting cases and explaining that statistical evidence may be probative of pretext in limited circumstances, and that such a determination "ultimately depends on all the surrounding facts, circumstances, and other evidence of

discrimination"). Accordingly, the court declines to strike Dr. Michael's weighting opinion on the ground that it is confusing, irrelevant, and unhelpful to the trier of fact.

### D

The court now considers BAE's motion as to Dr. Michael's defective factor opinion. BAE argues that this opinion is irrelevant and does not help the trier of fact understand the evidence or determine a fact in issue because the fact that BAE's rating criteria were ambiguous or poorly defined is not probative of an intent to discriminate. The court disagrees. Evidence that criteria on the RIF spreadsheet were ambiguous, poorly defined, and redundant with other criteria is circumstantial evidence under the facts and circumstances of this case that BAE's proffered legitimate, nondiscriminatory reason is pretextual. This is because it suggests that the decisionmaker for the RIF—Briggs, working in conjunction with Clarkson and Atherholt—designed the criteria to serve as a facially neutral *post hoc* justification for terminating plaintiffs. Contrary to BAE's suggestion, plaintiffs do not offer Dr. Michael merely to testify that he would have designed the spreadsheet differently. Rather, plaintiffs offer Dr. Michael to testify that, based on a statistical analysis of the criteria, two factors are largely redundant and do not appear tied to any objectively measurable criteria.[23] This opinion is relevant because it could help the trier of fact

_____

[23]BAE's reliance on *Chin v. Port Authority of New York & New Jersey*, 685 F.3d 135 (2d Cir. 2012), is misplaced. In *Chin* the Second Circuit held that the district court did not abuse its discretion when it excluded testimony from an expert who relied on a cursory analysis of plaintiffs' qualifications by "summ[ing] up their qualifications in a few sentences" and then comparing each plaintiff to employees who had been promoted. *See id.* at 161. Here, by contrast, Dr. Michael is not comparing plaintiffs' relative qualifications, and

understand the relationship between different factors on the RIF spreadsheet and determine whether BAE's stated reason for using such criteria as part of the decisionmaking process is pretextual. Accordingly, the court declines to strike Dr. Michael's defective factor opinion on the ground that it is irrelevant.

E

Because the court concludes that Dr. Michael's statistical significance, weighting, and defective factor opinions are relevant and reliable, and that he is qualified to render them, the court denies BAE's motion to exclude Dr. Michael's testimony as to these opinions. The court denies as moot the remainder of BAE's motion to exclude Dr. Michael's testimony.

VIII

The court next considers BAE's motion to strike the expert testimony of Dr. Ainslie.

A

Plaintiffs offer Dr. Ainslie, a clinical psychologist, to testify about plaintiffs' claims of mental anguish and emotional distress as a result of their terminations. Dr. Ainslie is expected to testify that plaintiffs have experienced "clinical levels of depression" and "moderate to severe levels of anxiety," and that their terminations may have been a contributing factor to these conditions. D. 10/4/2013 App. 21. BAE moves to strike this

---

his analysis is more sophisticated. Dr. Michael calculated the correlation between two sets of variables that were created by BAE (not by him), and he determined that a high degree of correlation between these sets of variables provided support for the view that the criteria were redundant and poorly defined. BAE does not address this aspect of his analysis, and thus presents no reason that Dr. Michael's underlying methodology is unreliable.

testimony in its entirety on the ground that Dr. Ainslie is not qualified to offer an opinion about mental anguish damages, and that his testimony is based on an unreliable methodology. Alternatively, BAE moves to strike certain aspects of Dr. Ainslie's proffered testimony.  It argues that Dr. Ainslie should be precluded from offering the following: (1) the opinion that race discrimination caused or contributed to plaintiffs' emotional distress, (2) any opinion about whether there were "statistical racial disparities" at BAE, (3) the opinion that plaintiffs had reliable memories, (4) any opinion that mentions a second-hand account of race-related conduct by plaintiffs, and (5) the opinion that plaintiffs were truthful to him during their interviews and were not malingering.  Plaintiffs oppose the motion.

B

The court first considers whether Dr. Ainslie is qualified to offer expert testimony concerning plaintiffs' claims for mental anguish and emotional distress damages.  BAE argues that Dr. Ainslie is not so qualified because he has a relatively small clinical practice (only seeing between ten and twelve patients a year), his specialty is hate crimes and community race relations, not employment discrimination, and he has never served as an expert witness in an employment discrimination lawsuit.

The court begins by clarifying the purpose for which plaintiffs offer Dr. Ainslie's testimony.  Contrary to BAE's suggestion, plaintiffs do not intend that Dr. Ainslie offer an opinion about the *amount* of damages plaintiffs seek, nor do they offer him to testify that

plaintiffs' psychological condition caused a physical disease.[24]  Rather, plaintiffs offer Dr. Ainslie to testify about his diagnostic impressions of each plaintiff and to opine whether the plaintiff's termination had any impact on his emotional health.  The Fifth Circuit has expressly approved of this sort of psychological expert testimony when it is offered to corroborate a plaintiff's claim for emotional distress damages.  *See Brady v. Fort Bend County*, 145 F.3d 691, 718 (5th Cir. 1998) (approving psychological testimony offered as corroborating evidence in support of plaintiffs' claim for mental anguish damages).

Furthermore, Dr. Ainslie is qualified to offer diagnostic impressions about what impact, if any, plaintiffs' terminations had on their emotional health.  He holds a Ph.D. in Clinical Psychology from the University of Michigan, is a tenured professor at the University of Texas at Austin, has maintained an active clinical practice for 30 years, and regularly presents his research at national professional conferences.[25]  BAE relies on a line of cases affirming the general principle that an expert's qualifications in one field do not necessarily

---

[24]For this reason, *Edmonds v. Illinois Central Gulf Railroad Co.*, 910 F.2d 1284 (5th Cir. 1990), which BAE cites, is inapposite.  In *Edmonds* a clinical psychologist opined that there was a causal link between the plaintiff's psychological condition (stress) and his pre-existing heart condition.  *Edmonds*, 910 F.2d at 1286-87.  The Fifth Circuit held that admitting this testimony was error because the expert's qualifications as a *psychological* expert did not qualify him as an expert on *physical* conditions, such as heart disease, since the expert had no experience making medical diagnoses of this sort and did not perform any medical tests on the plaintiff.  *Id.* at 1287.

[25]Additionally, Dr. Ainslie's lack of previous experience as an expert witness does not make him unqualified.  *See, e.g., Nunn*, 2010 WL 2540754, at *3 n.4.  "[A proposed expert's] lack of experience as an expert witness is no bar to his testimony.  An expert witness must be an expert in a given field, not an experienced witness."  *Rolls-Royce Corp. v. HEROS, Inc.*, 2010 WL 184313, at *5 (N.D. Tex. Jan. 14, 2010) (Fitzwater, C.J.).

make the expert qualified to testify about subject matter in another field.  *See, e.g., Amos v. Rent-A-Ctr., Inc.*, 2001 WL 36095915, at *2 (S.D. Fla. Dec. 13, 2001) (noting that neuropsychologist specializing in closed-head brain injuries only "marginally qualified" to testify about emotional health in employment discrimination case).   This principle is inapposite here because Dr. Ainslie is a clinical psychologist, he maintains an active clinical practice, and he is offered to opine about his diagnostic impressions of each plaintiff.  Thus the court concludes that Dr. Ainslie is qualified to offer the opinions contained in his expert report.

## C

The court next considers whether Dr. Ainslie's testimony is based on a reliable methodology.  BAE provides a laundry list of short, underdeveloped reasons for concluding that Dr. Ainslie's testimony is unreliable: Dr. Ainslie has not explained why he excluded other causal explanations for plaintiffs' condition, his analysis is based on a short 90-minute interview with each plaintiff, and the methodology he applied is subjective and not subject to testing or peer review.   Yet BAE fails to address the principles and methods that Dr. Ainslie used to analyze each plaintiff.  In his expert report, Dr. Ainslie makes clear that he administered several well-established psychological tests, including the Beck Depression Inventory II, the Beck Anxiety Inventory, and the Achenbach System of Empirically Based Assessment/Adult Self Report.[26]  *See, e.g., Reference Manual on Scientific Evidence* 836 &

---

[26]For this reason, *Elcock v. Kmart Corp.*, 233 F.3d 734 (3d Cir. 2000), which BAE cites, is distinguishable.  In *Elcock* the court held that several *Daubert* factors supported the

n.123 (3d ed. 2011) (noting that formal testing of psychological functions may be used to complement the clinical diagnostic process and specifically noting that the Beck Depression Inventory is commonly used to measure severity of symptoms). And, in addition to meeting with each plaintiff individually, he reviewed each plaintiff's medical records and deposition testimony. Because the principles and methods that underpin Dr. Ainslie's evaluation are reliable, the court declines to strike his testimony on this basis.

D

The court now turns to BAE's contention that Dr. Ainslie should be precluded from offering the opinion that race discrimination caused or contributed to plaintiffs' emotional distress. In support of its position, BAE relies on *Patterson v. P.H.P. Healthcare Corp.*, 90 F.3d 927 (5th Cir. 1996), *overruled on other grounds by Williams v. Wal-Mart Stores, Inc.*, 182 F.3d 333 (5th Cir. 1999) (en banc) (per curiam). In *Patterson* the Fifth Circuit vacated the district court's emotional damage award and held that the plaintiff was only entitled to nominal damages. *Id.* at 941. The panel explained that, although the plaintiff testified that she suffered mental anguish during her unemployment, she failed to offer competent

---

conclusion that the expert's testimony was inadmissible, where the expert—with no formal training in vocational rehabilitation—opined that the plaintiff was "between 50 and 60 percent vocationally disabled." *Id.* at 740, 743. On cross-examination at trial, he failed to explain his method for arriving at the 50-60% figure and could not present any objective evidence to support his conclusion. *Id.* at 747-48. Here, by contrast, Dr. Ainslie has formal training in the underlying subject matter, has not attempted to offer a precise figure for the degree to which plaintiffs' terminations or perceptions that they were discriminated against contributed to their psychological conditions, and has presented objective evidence to support his conclusions.

evidence corroborating her testimony. *Id.* In particular, the panel noted that the plaintiff had failed to offer any "expert medical or psychological evidence . . . to support [her] claim for emotional harm." *Id.*

Contrary to BAE's position, *Patterson* actually supports the admission of Dr. Ainslie's testimony because it underscores the necessity that a Title VII plaintiff present corroborating evidence, such as expert testimony from a psychologist, to support a claim for emotional distress or mental anguish damages. This is precisely the reason for which plaintiffs offer Dr. Ainslie's expert testimony.

In its reply, BAE acknowledges for the first time that Dr. Ainslie's testimony is based on objective psychological examinations, *see* D. 11/7/2013 Reply Br. 4, but it argues that these examinations only test the severity of plaintiffs' symptoms, not their cause. This challenge, however, goes to the weight of the testimony, and it can be attacked through vigorous cross-examination and the presentation of contrary evidence. For example, Dr. Ainslie testified by deposition that "for each of these individuals, there are probably multiple sources for what they're dealing with," D. 10/4/2013 App. 35, and that he could not determine exactly the degree to which the perception of race discrimination contributed to their psychological conditions when compared to other stressors, *id.* at 62. BAE can demonstrate through cross-examination and its own evidence that there are other possible causes for plaintiffs' emotional problems, and that Dr. Ainslie cannot rule out these other explanations or quantify the impact that BAE's conduct had on their psychological conditions.

- 67 -

Accordingly, the court declines to strike this portion of Dr. Ainslie's testimony.

E

The court next considers whether Dr. Ainslie should be precluded from offering any opinion about whether there were "statistical racial disparities" at BAE.  BAE contends that Dr. Ainslie attempts to "buttress" his conclusion about race discrimination's being a likely cause of emotional distress by referencing some "crude statistics"—that BAE's minority FSR force dropped from 21% to 8% as a result of the RIF.  D. 10/4/2013 Br. 13.  BAE does not argue that this statistic is incorrect.  Instead, it asserts that it is "meaningless, unfairly prejudicial[,] and . . . far afield from [Dr. Ainslie's] expertise in psychology." *Id.*  The court disagrees with BAE's characterization of Dr. Ainslie's testimony.  When read in context, Dr. Ainslie's opinion is merely that plaintiffs perceived that their terminations were motivated by racism because they realized that minorities were disproportionately affected by the RIF.  Dr. Ainslie's expert report cites studies suggesting that individuals who perceive themselves as victims of racism often experience psychological distress.  Based on Dr. Ainslie's expert report and his deposition testimony, it is clear that he is not attempting to offer any statistical evidence to support plaintiffs' race discrimination claim.  Rather, he is merely offering psychological testimony (coupled with simple arithmetic) about the impact that plaintiffs' perception (true or not) that their terminations were racially motivated had on their emotional well-being.  Accordingly, the court declines to strike this portion of Dr. Ainslie's testimony.

F

The court now turns to BAE's contention that Dr. Ainslie should be precluded from offering the opinion that plaintiffs had reliable memories. In his report, Dr. Ainslie notes that each plaintiff's "memory was intact" and that each plaintiff "appeared to have good judgment" at the time of the psychological assessment. D. 10/4/2013 App. 11-12. BAE moves to strike this testimony on the ground that it is unreliable because Dr. Ainslie did not perform any scientific tests of plaintiffs' memories. Given the limited nature of Dr. Ainslie's testimony on the subject, the court declines to strike this opinion on this ground. When read in context, it is clear that Dr. Ainslie's testimony regarding each plaintiff's memory and judgment is merely offered to establish the foundation for Dr. Ainslie to testify about his diagnostic impressions. Evaluating a patient's memory and judgment is a routine part of this type of psychological assessment. That Dr. Ainslie did not perform any specific test of plaintiffs' memories relates to the basis of his expert opinion, and, as such, affects the weight to be assigned that opinion rather that its admissibility. BAE will have the opportunity to challenge this testimony on cross-examination.

G

The court next considers whether Dr. Ainslie should be precluded from offering any opinion that mentions a second-hand account of race-related conduct by plaintiffs. Dr. Ainslie's expert report recounts several instances in which individual plaintiffs recounted race-related events from their tenure at BAE. For example, Whitley reported to Dr. Ainslie that he overheard Clarkson tell Swoda, "When I get rid of some of these [ni---rs][,] I'll make

you an FSR." *Id.* at 7.   BAE argues that this testimony should be stricken because the underlying reports of race-related conduct are either "untruthful" or "constitute speculative hearsay." D. 10/4/2013 Br. 14.  The court disagrees.  This testimony is not hearsay because it is not being offered to prove the truth of the matter asserted.  *See* Rule 801(c).  Plaintiffs are not offering this testimony to prove that the underlying events occurred; rather, they are offering it to prove that plaintiffs described the events to Dr. Ainslie.  And Dr. Ainslie relied on this evidence in reaching his ultimate opinion about plaintiffs' emotional health.  Under Rule 703,

> [a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

Rule 703.[27]  As a result, provided the predicate under Rule 703 is satisfied,  Dr. Ainslie can rely on plaintiffs' second-hand accounts of race-related conduct for purposes of expressing an expert opinion.[28]  As such, the court declines to strike Dr. Ainslie's testimony on this

---

[27]Rule 703 also includes a balancing test if the facts or data would otherwise be inadmissible: "But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect."

[28]BAE argues that Whitley denied making at least two of the statements that Dr. Ainslie attributes to Whitley (that Whitley told him that Clarkson had been disciplined during his military service for using racially derogatory language, and that Whitley complained of discrimination while at BAE).  Whether Whitley denied making these statements at his deposition is immaterial, because Dr. Ainslie's testimony is not being offered to prove that the underlying events occurred.  To the extent there are inconsistencies between Dr. Ainslie's testimony about what Whitley told him during his psychological examination and Whitley's

basis.

H

Finally, the court turns to BAE's contention that Dr. Ainslie should be precluded from offering the opinion that plaintiffs were truthful to him during their interviews and were not malingering.  In his expert report, Dr. Ainslie states, in pertinent part:

> With so much at stake, it is important to address the reliability of the plaintiff[s'] claims in this case.  Given the circumstances, it is understandable if the reader of this report has some skepticism of [their] claims, given what each plaintiff stands to gain.  Considering the potential outcome of this case, it is important to stay up-to-date of the latest information that is available on malingering, otherwise known as "faking-bad" for the purposes of providing the courts with the most reliable and valid data in forensic cases.  I have used experience in both research and clinical work to conduct sound evaluations for this forensic purpose.  Considering the research and comparing that with the clinical interviews and assessment results the plaintiffs completed, it is highly unlikely that the plaintiffs were attempting to deceive the examiner.

D. 10/4/2013 App. 20 (alterations added).  BAE argues that this testimony is unreliable because it is not based on any specific data or established criteria for evaluating whether someone is malingering.

The court declines to strike this testimony on the ground that it is unreliable.  Although this isolated excerpt of Dr. Ainslie's expert report is not based on specific data or quantitative criteria, Dr. Ainslie clarified during his deposition that there was, in fact, a reliable basis for the opinion:

---

testimony, they should be left for the trier of fact's consideration.

- 71 -

Dr. Ainslie: One of the ways in which people evaluate whether a patient is being honest with you or conveying things in a way . . . that adequately sort of captures what happened, is . . . if there's an absence of specificity, for example, that might make you suspect; if there are absolutely no gaps in their memory, if it's as if they've rehearsed something, as if they have come in with a preformulated set of data to present to you, that may suggest . . . that they're not being honest for some reason or another.

* * *

Counsel: So what did you compare—what research did you compare with the clinical interviews and assessment results?

Dr. Ainslie: Well, you know, that may not be written very clearly. I did not take study X and lay it over the transcript of the interview and say, aha, . . . we have absolute concordance here . . . . It's really more based on the synthesis of material. You know, one part of that material . . . is my experience as a clinician, as having seen hundreds of patients and interviewed people for all kinds of issues and for all kinds of reasons. That's one source of data that goes into that synthesis. The objective measures are another source of data. And . . . these measures are also used in research.

*Id.* at 59 (alterations added, paragraph break omitted). When read in context, it is clear that although Dr. Ainslie did not use a particular test for determining whether someone was malingering, he based his opinion on a combination of factors: academic research, his clinical experience, and each plaintiff's results on the three well-established psychological tests discussed above. This foundation provides a reliable basis on which to offer an opinion.

Indeed, courts routinely admit expert testimony about whether a certain individual is malingering when the testimony is based on sound academic research, clinical experience, and results of similar tests. *See, e.g., Panetti v. Stephens*, 727 F.3d 398, 403 (5th Cir. 2013) (noting that multiple experts evaluated plaintiff to determine likelihood of malingering); *United States v. Merriweather*, 921 F.Supp.2d 1265, 1300 (N.D. Ala. 2013) (noting that court was "impressed" with expert testimony from psychiatrist who testified that defendant was malingering).

Moreover, it is important to focus on the relatively confined scope of the opinion. Dr. Ainslie opines that "it is highly unlikely that the plaintiffs were attempting to deceive [him]" *during their examinations*. D. 10/4/2013 App. 20. As far as the court can determine, plaintiffs do not purport to offer this testimony for the broader purpose of establishing each plaintiff's credibility or truthfulness *in general, or during their trial testimony*. Rather, plaintiffs seek to offer Dr. Ainslie's opinion that his psychological assessment of each plaintiff was not skewed by any plaintiff's malingering, and that plaintiffs' test results, as a form of objective psychological evidence, corroborate their claim for mental anguish and emotional distress damages.

The court notes that expert testimony about plaintiffs' truthfulness or credibility could theoretically cross the line into inadmissibility by, for example, invading the province of the jury. *See, e.g., Nichols v. Am. Nat'l Ins. Co.*, 154 F.3d 875, 882-84 (8th Cir. 1998) (holding that expert's testimony impugning the "psychiatric credibility" of plaintiff was inadmissible under Rules 403 and 702 because it was "thinly veiled comment on a witness' credibility").

- 73 -

If Dr. Ainslie attempts at trial to offer materially different testimony from what the court is considering here, BAE can object, and the court will consider whether the objection has merit in the context of the proffered testimony.  In no event will plaintiffs be permitted to offer Dr. Ainslie's testimony merely to bolster a plaintiff's credibility as a witness at trial.  *See, e.g., Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005) (noting that expert witnesses may not improperly bolster account given by fact witnesses).

In light of the opinion's limited scope and the reliable basis on which it is predicated, the court declines to strike this part of Dr. Ainslie's expert opinions.

## I

Because the court concludes that Dr. Ainslie is qualified to testify on the opinions he has offered, and because these opinions are relevant and based on reliable principles and methods, the court denies BAE's motion to exclude Dr. Ainslie's testimony.

## IX

Finally, the court considers BAE's motion for severance under Rule 21, or for separate trials under Rule 42.

## A

Rule 21 provides that a "court may . . . sever any claim against a party." Fed. R. Civ. P. 21.  As the movant, BAE bears the burden in seeking severance under Rule 21.  *See, e.g., Paragon Office Servs., LLC v. UnitedHealthCare Ins. Co.*, 2012 WL 4442368, at *1 (N.D. Tex. Sept. 26, 2012) (Fitzwater, C.J.).  "The trial court has broad discretion to sever issues to be tried before it."  *Brunet v. United Gas Pipeline Co.*, 15 F.3d 500, 505 (5th Cir. 1994).

Courts consider the following factors in determining whether to sever claims under Rule 21:

> (1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims.

*Morris v. Northrop Grumman Corp.*, 37 F.Supp.2d 556, 580 (E.D.N.Y. 1999); *see also Aspen Tech., Inc. v. Kunt*, 2011 WL 86556, at *2 (S.D. Tex. Jan. 10, 2011).

Rule 42(b) authorizes the court to order a separate trial of one or more issues "[f]or convenience, to avoid prejudice, or to expedite and economize." Rule 42(b). "[T]he party seeking bifurcation has the burden of showing that separate trials are proper in light of the general principle that a single trial tends to lessen the delay, expense and inconvenience." *Belisle v. BNSF Ry. Co.*, 697 F.Supp.2d 1233, 1250 (D. Kan. 2010) (internal quotation marks omitted); *Lowe v. Phila. Newspapers, Inc.*, 594 F. Supp. 123, 125 (E.D. Pa. 1984) (same). The court has the discretion to bifurcate a trial. *See, e.g., Siddiqui v. AutoZone W., Inc.*, 2010 WL 2925077, at *1 (N.D. Tex. July 20, 2010) (Fitzwater, C.J.).

B

BAE contends that severance or separate trials is necessary because plaintiffs' legal claims arise from disparate factual contentions, and that a single trial will result in jury confusion and prejudice to BAE.[29] Representative of this argument is BAE's assertion in its

---

[29]BAE does not argue that plaintiffs' claims have been improperly joined.

- 75 -

reply brief that "Plaintiffs' claims are loosely tied together by little more than the fact that each Plaintiff was notified of his termination on the same date as the others." D. 11/5/2013 Reply Br. 1. It argues that because plaintiffs' claims are only loosely tied together, a single trial will confuse the jury and prejudice BAE because each plaintiff will be able to bolster its case by bootstrapping his allegations to the cumulative weight of the evidence relating to the other plaintiffs.

Plaintiffs respond that the relevant factors under Rule 21 and Rule 42 weigh in favor of a single trial. They argue that, contrary to BAE's characterization, their claims are closely connected because all five plaintiffs worked in the same division at Fort Hood, held the same position as either a FSR or Sr. FSR, were supervised by the same two Staff FSRs, and were terminated in the same RIF on the same day by the same titular decisionmaker.

BAE has failed to persuade the court that a severance or separate trials are warranted under the relevant factors. Plaintiffs' claims arise out of the same transaction or occurrence because plaintiffs were terminated as part of the same RIF, by the same titular decisionmaker (Briggs), who relied on input by the same set of direct supervisors (Clarkson and Atherholt). Consequently, plaintiffs' claims present many common questions of law or fact, including, for example, the overarching question whether BAE's proffered legitimate, nondiscriminatory reason for plaintiffs' terminations—which is the same reason as to all five plaintiffs—is pretextual. Although there are some differences between the factual allegations supporting the retaliation claims asserted by Johnson and Whitley and the race discrimination claims brought by all five plaintiffs, these differences do not outweigh the major similarities

that predominate the underlying questions raised in this case.[30]  Moreover, BAE has not

shown why proper jury instructions will be insufficient to cure any potential confusion

caused by the fact that there is both a retaliation claim and a race discrimination claim in this

case.  Other than relying on the speculative prospect of jury confusion, BAE does not provide

any other reason why it will be prejudiced by a single trial.  In addition, plaintiffs rely on

many of the same witnesses and documentary evidence to support their claims.  Based on the

foregoing, the court concludes that a single trial would promote the interest of judicial

economy.[31]  Given the substantial similarities among the plaintiffs, multiple trials would

certainly involve duplicative presentations of evidence.  Because BAE has failed to

demonstrate that severance or bifurcation is warranted in light of the relevant factors, the

---

[30]BAE argues that Allen and Daniels, who bring only race discrimination claims, should not be able to rely on evidence that the plaintiffs bringing retaliation claims did not receive the same job opportunities, training, promotions, and responsibilities as similarly situated Caucasian employees, or that they were required to perform tasks that similarly situated Caucasian employees were not required to perform.  Because the court is granting summary judgment as to these allegations, *see supra* note 9, this ground for severance or separate trials has been mooted.  But even if it were not, BAE has failed to demonstrate that this concern cannot be adequately addressed by properly instructing the jury.

[31]In support of its position, BAE relies primarily on *Henderson v. AT&T Corp.*, 918 F. Supp. 1059 (S.D. Tex. 1996), *abrogated on other grounds as recognized by Holmes v. Energy Catering Servs., LLC*, 270 F.Supp.2d 882, 886 n.4 (S.D. Tex. 2003).  That reliance is misplaced.  In *Henderson* the five plaintiffs worked in four separate offices, were directly supervised by different managers in each office, and did not identify any specific discriminatory policy or practice to which they were subjected.  *Henderson*, 918 F. Supp. at 1061.  Here, by contrast, the plaintiffs all spent time working at Fort Hood, were directly supervised by the same two managers (Clarkson and Atherholt), and identify their April 2011 terminations, which occurred on the same day as part of the same RIF, as the adverse employment action being challenged.

court denies the motion.

*   *   *

For the reasons explained, BAE's motion for summary judgment is granted in part and denied in part.  BAE's motion to exclude testimony of Dr. Michael, motion to exclude testimony of Dr. Ainslie, and motion for severance or separate trials are denied.

**SO ORDERED**.

April 30, 2014.

 

 

SIDNEY A. FITZWATER
CHIEF JUDGE